A. T. Miller and Estate of Eleanor A. Miller, Deceased, First Trust Company of Saint Paul, Special and General Administrator, Petitioners, *v.* Commissioner of Internal Revenue, Respondent.

A. T. Miller and Estate of Eleanor A. Miller, Deceased, First Trust Company of Saint Paul, Administrator, Petitioners, *v.* Commissioner of Internal Revenue, Respondent.

Docket Nos. 87484, 91439.   Filed March 20, 1963.

*James R. Oppenheimer, Esq.,* for the petitioners.
*Robert F. Cunningham, Esq.,* for the respondent.

Mulroney, *Judge:* The respondent determined the following deficiencies in the petitioners' income tax for the years 1956, 1957, and 1958:

| Year | Deficiency |
| --- | --- |
| 1956 | $43,205.92 |
| 1957 | 8,112.82 |
| 1958 | 92,337.60 |

The issues are (1) whether the administration of the estate of Addison Miller (who died in 1944) should have been closed prior to 1956, in which event certain income reported by the estate in 1956 and 1957 would be taxable to petitioners in those years; (2) whether petitioners are entitled to a deduction in 1958 arising from the purported loss of goodwill in that year; and (3) whether petitioners are entitled to a deduction of certain club expenditures as business expenses in 1958.

### FINDINGS OF FACT.

Some of the facts were stipulated and they are found accordingly.

A. T. Miller and Eleanor A. Miller were husband and wife during the years here involved and were residents of St. Paul, Minn. They filed joint income tax returns for the years 1956, 1957, and 1958 with the district director of internal revenue, St. Paul, Minn. Eleanor A. Miller died May 11, 1959. A. T. Miller will hereinafter sometimes be called the petitioner.

Prior to 1938 Addison Miller, Inc., a Minnesota corporation, was engaged in the business of performing certain services for railroad companies under contracts, such as furnishing railroad boarding

camps with meals and lodging, operating retail concessions, manufacturing, harvesting, and handling ice, icing railroad cars, cleaning railroad cars, operating coal docks, and similar operations. The stockholders and the percentage of stock held by them in the corporation were Addison Miller, 55 percent; petitioner, 20 percent; and George Faltico, 25 percent.

In 1937 a partnership was formed by Addison Miller (petitioner's brother), petitioner, and George Faltico with the ownership of said partnership and the interest in the profits and losses thereof being 55 percent, 20 percent, and 25 percent, respectively. This partnership was known as the Addison Miller Co. The partnership maintained its books and records on an accrual basis.

Shortly after the formation of Addison Miller Co., Addison Miller, Inc. (Minnesota corporation), discontinued the services which it had previously carried out for various railroad companies. Thereafter, through renegotiation or assignment of the contracts with the railroads, Addison Miller Co. conducted said services for the railroad companies. Most of the equipment, title to which remained in Addison Miller, Inc. (Minnesota corporation), necessary to perform the various services for the railroad companies was leased to the Addison Miller Co.

Addison Miller died September 7, 1944, a resident of Pasco County, Fla. His will named petitioner as sole heir and executor. The will was duly admitted to probate by the Court of County Judge, Pasco County, Fla., and petitioner, under orders of said court, became the duly appointed, acting, and qualified executor of the estate of Addison Miller.

On January 24, 1945, the Court of County Judge, Pasco County, Fla., ordered that "Allen T. Miller in his representative capacity as Executor of the Last Will and Testament of Addison Miller, deceased, is hereby authorized and empowered to carry on the business of Addison Miller Company for and in behalf of this estate."

Addison Miller, as of the date of his death, in addition to his interest in Addison Miller, Inc. (Minnesota corporation), and Addison Miller Co., owned among other interests the majority of stock in the following corporations: (1) Addison Miller, Inc., an Illinois corporatin; (2) Great Northern Icing Co.; and (3) Commercial Investment Co.

On September 7, 1944, the interests of Addison Miller, petitioner, and George Faltico in the partnership profits and losses were 55 percent, 20 percent, and 25 percent, respectively. The estate of Addison Miller succeeded to the decedent's 55-percent interest in the partnership after September 7, 1944. George Faltico died on July 29, 1945, and the petitioner acquired Faltico's 25-percent partnership interest from his estate, so that on January 1, 1946, the partners and

their partnership interests in Addison Miller Co. were the estate of Addison Miller, 55 percent, and petitioner, 45 percent. A. T. Miller also acquired in 1945 the 25-percent interest held by Faltico in Addison Miller, Inc. (Minnesota corporation), and Addison Miller, Inc. (Illinois corporation).

On June 6, 1945, the Federal District Court for the District of Minnesota issued its "Findings and Order" in Civil Action No. 255 brought by the U.S. Department of Labor against Addison Miller Co. and other defendants. The defendants were found guilty of contempt of court for failing to comply with a judgment of the Federal District Court entered on July 17, 1941, which had adjudged that the defendants were liable for certain wage and hour payments under the Fair Labor Standards Act of 1938.

Addison Miller Co. on January 14, 1942, had moved to vacate or modify the 1941 judgment on several grounds. The Federal District Court held that it lacked jurisdiction to order Addison Miller Co. to make payments of restitution and to that extent vacated and modified its earlier decree. On appeal to the Court of Appeals for the Eighth Circuit the appellate court held that the lower court did have the jurisdiction to order restitution. On March 13, 1944, the U.S. Supreme Court denied defendant's petition for certiorari. The June 6, 1945, order of the Federal District Court specified that the defendants were within a prescribed time to pay the sum of $100,645.24 to the U.S. Department of Labor. Addison Miller Co. during the months of June and July of 1945 issued checks totaling $90,714.54, which sum represented the total amount paid by Addison Miller Co. pursuant to the June 6, 1945, order of the Federal District Court.

The books and records of Addison Miller Co. did not show any wage and hour liability as of September 7, 1944.

An adjusted trial balance prepared from the books and records of Addison Miller Co. as of September 7, 1944, showed the following:

*Assets*

| | |
|---|---:|
| Cash | $23, 233. 32 |
| Receivables | 1, 012, 631. 50 |
| Inventory | 102, 309. 10 |
| Investments | 8, 300. 00 |
| Prepaid expense | 25, 337. 13 |
| Net depreciation assets | 15, 312. 66 |
| | 1, 187, 123. 71 |

*Liabilities*

| | |
|---|---:|
| Payables | 650, 755. 71 |
| Intercompany account | 318, 172. 72 |
| | 968, 928. 43 |

*Net worth*

| | |
|---|---:|
| Reserve for contingencies | $23,000.80 |
| Profit and loss accounts | 144,274.16 |
| Addison Miller | 92,794.55 |
| A. T. Miller | (1,879.75) |
| George Faltico | (39,994.48) |
| | 218,195.28 |
| | 1,187,123.71 |

The adjusted trial balance above reflects a net profit of $144,274.16 for the period from January 1, 1944, to September 7, 1944, which represents the allocated portion of the net profit of $210,375.87 for the entire year 1944.

The profit and loss of Addison Miller Co. for the year ended December 31, 1944, shows the following gross income:

| Department | Gross income |
|---|---:|
| Retail | $669,665.52 |
| Boarding | 3,381,121.37 |
| Rental | 4,855.93 |
| Ice Manufacturing | 134,816.54 |
| Ice Harvesting | 51,550.33 |
| Car Icing | 98,262.57 |
| Car Cleaning | 25,565.34 |
| Coal Handling | 134,746.20 |
| Storage | 17,417.69 |
| Quarry | 37,483.35 |
| Engineering | 13,457.05 |
| General Management | 5,794.85 |
| Total gross income | 4,574,736.74 |

In its partnership returns of income for the years 1954, 1955, 1956, and 1957 (January 1, 1957–February 28, 1957) the Addison Miller Co. showed net profits of $95,735.44, $86,576.42, $94,914.17, and $6,489.36, respectively.

In the tax return filed for Addison Miller for the taxable period January 1 to September 7, 1944, there was reported distributable net income from the partnership in the amount of $79,350.79 (55 percent of $144,274.16).

In the Federal estate tax return for the estate of Addison Miller the decedent's 55-percent interest in Addison Miller Co. was listed in schedule F at a value of $4,560.45. There was listed in the same schedule the amount of $92,794.55, representing the amount in decedent's drawing account due from the partnership. Respondent in 1948 determined a deficiency in the estate tax of the estate of Addison Miller. A settlement was reached by the parties and a decision was entered by the Tax Court in June 1954. Among the adjustments made the fair market value of decedent's 55-percent interest in Addi-

son Miller Co. was determined to be $175,301.21, and this valuation was used by the parties in the final settlement.

The estate of Addison Miller reported the following amounts of income in its fiduciary income tax returns as follows:

| Year | Income from Addison Miller Co. | Total income |
|------|-------------------------------|--------------|
| 1944 (Sept. 8–Dec. 31) | $36, 355. 94 | $56, 106. 42 |
| 1945 | 82, 340. 10 | 89, 394. 99 |
| 1954 | 52, 654. 49 | 61, 767. 33 |
| 1955 | 47, 617. 03 | 53, 040. 47 |
| 1956 | 52, 202. 79 | 58, 259. 56 |

In its final return for the period January 1 to July 30, 1957, the estate reported income of $3,569.15 from Addison Miller Co. and $30 of dividend income. It reported no other income in the final return.

In 1947 and 1948 the respondent proposed certain adjustments in taxable net income and distributable net income of Addison Miller Co. for the years 1937 through 1944, and for the years 1945 through 1947 under section 45 of the Internal Revenue Code of 1939 against Addison Miller Co. and A. T. Miller, individually and as executor of the estate of Addison Miller. This matter was settled on or about October 25, 1951.

The commissioner of taxation for the State of Minnesota in two separate orders ordered additional income tax against the estate of Addison Miller for 1942 and 1944. Thereafter the Board of Tax Appeals of the State of Minnesota reversed the commissioner of taxation in both cases holding that Addison Miller was domiciled in Florida during the years involved. On July 19, 1953, the Supreme Court of the State of Minnesota issued its opinion affirming the Board of Tax Appeals of the State of Minnesota (*Miller's Estate* v. *Commissioner of Taxation*, 59 N.W. 2d 925 (Minn. 1953)).

For the years 1940 and 1942 through 1947 the commissioner of taxation for the State of Minnesota increased the amount of income of Addison Miller, Inc. (Minnesota corporation), for Minnesota income tax purposes, by way of rent for the equipment to the corporation from Addison Miller Co. and also increased the corporation's gross income by way of interest on the average amount of indebtedness due the corporation in each of those years from Addison Miller Co. The Board of Tax Appeals of the State of Minnesota affirmed the orders of the commissioner of taxation, and on February 8, 1957, the Supreme Court of the State of Minnesota issued its opinion and order affirming the decision of the Board of Tax Appeals of the State of Minnesota. (*Addison Miller, Inc.* v. *Commissioner of Taxation*, 81 N.W. 2d 89 (Minn. 1957)).

On July 17, 1952, Gerald R. Stintzi, employed by Addison Miller Co. at Yardley, Wash., was injured and in August 1952, he commenced an action against the Northern Pacific Railway Co. and

sought recovery of $160,000. The insurance coverage carried by Addison Miller Co. was $100,000 for one individual. At the time of the accident Addison Miller Co. was performing icing services for Northern Pacific Railway Co. under a contract dated July 18, 1936, and under which it had agreed to indemnify and save the railway company harmless from all claims and causes of action by employees or third persons on account of personal injuries, death, or damage to property in any manner caused by, arising from, or accruing out of the maintenance or operation of said ice plant or handling of ice under the contract. On February 8, 1954, Stintzi filed an amended complaint increasing the amount of damages claimed to $250,000. The matter was tried in Federal District Court in the State of Washington and on July 3, 1954 the jury awarded the plaintiff $148,000. The award was appealed to the Federal Court of Appeals for the Eighth Circuit and argument was made before the court on September 7, 1955. On September 20, 1955, the above case was settled for $96,500.

On December 28, 1956, the Illinois Central Railroad notified the Addison Miller Co. that the railroad had received a refund from the Internal Revenue Service of certain payroll taxes paid in connection with the Addison Miller Co. employees on the ground that such employees performing services for the railroad were not in the service of the railroad and therefore their wages were not subject to payroll taxes. A portion of the refund was to be repaid to the employees and a portion retained by the railroad.

There were ancillary proceedings for the estate of Addison Miller in Minnesota, Washington, and Montana. The Minnesota ancillary proceedings were closed in December 1955, the Washington ancillary proceedings were closed in the fall of 1957, while the ancillary proceedings in Montana had not yet been closed at the time of trial.

In a letter dated May 9, 1956, written at petitioner's suggestion, request was made of Sam Y. Allgood, the Florida attorney for the estate of Addison Miller, about proceeding to close the administration of the estate. In a reply dated May 23, 1956, Allgood referred to a Florida statute allowing a sole beneficiary of an estate to waive the annual and final accountings and he enclosed such a waiver and consent for A. T. Miller's signature, as well as a petition for distribution and discharge. The waiver was executed by petitioner, individually, under date of February 19, 1957, and the petition for order of distribution and discharge of executor was executed by him, as executor of the estate, on the same date.

On March 29, 1957, the Court of the County Judge for Pasco County, Fla., entered its "Order waiving annual and final accountings and directing distribution" in the matter of the estate of Addison Miller. Florida probate proceedings for the estate were completed in June 1957.

As of February 28, 1957, as shown by the books and records of Addison Miller Co., petitioner received as an heir from the estate of Addison Miller the estate's interest in the Addison Miller Co.

The principal contracts under which Addison Miller Co. operated were cost-plus contracts with the various railroad companies. Under these contracts Addison Miller Co. would settle with the railroad companies at the end of each calendar year after an audit of all costs and expenditures were made. Addison Miller Co. generally made monthly billings for services to the various railroads. All of the contracts provided for termination dates ranging from 30 days to 6 months after notice.

On February 28, 1957, the following contracts were in effect between Addison Miller Co. and the indicated railroads:

[1] A. Contract dated May 1, 1936, with Great Northern Railway Co.
[2] B. Contract dated May 18, 1938, with Northern Pacific Railway Co.
[2] C. Contract dated January 1, 1955, with Northern Pacific Railway Co.
[2] D. Contract dated January 1, 1957, with Northern Pacific Railway Co.
[2] E. Contract dated September 1, 1936, with Northern Pacific Railway Co.
[1] F. Contract dated January 1, 1951, with Spokane, Portland, and Seattle Railway Co.
[2] G. Contract dated October 20, 1944, with Illinois Central Railroad Co.
[3] H. Contract dated October 20, 1944, with Illinois Central Railroad Co.
[4] I. Contract dated April 2, 1940, with Great Northern Railway Co.
J. Contract dated January 31, 1952, with Soo Line (Minneapolis, St. Paul & Sault Ste. Marie Railroad Co.)
K. Contract dated January 31, 1952, with Wisconsin Central Railroad Co.
L. Contract with Duluth, South Shore, and Atlantic Railroad Co.

[1] Boarding contracts.
[2] Ice harvesting, manufacture, and/or icing service contracts.
[3] Cleaning railroad cars, handling livestock and mail, and other services.
[4] Operating retail concession.

Great Northern Railroad Co. guaranteed expenses under the contract (I) leasing certain depot concessions to Addison Miller Co. and the contract also provided that the railroad would share in any net profits.

Effective February 28, 1957, all of the contracts outstanding on that date were, with the consent of the respective railroad companies, transferred from Addison Miller Co. to petitioner, doing business as Addison Miller Co. During the years 1957 and 1958 the contract (designated A) with Great Northern Railway Co. accounted for about 55 percent of the business of Addison Miller Co.

The two contracts with Illinois Central Railroad Co. (listed above as G and H) were replaced by the contracts dated May 27, 1958. They were executed by the railroad and by petitioner, doing business as Addison Miller Co.

The contracts listed above, including the two contracts dated May 27, 1958, which replaced contracts G and H, were canceled as follows:

| Contract | Effective cancellation date | Canceled by— |
|---|---|---|
| A | December 31, 1958 | Railroad. |
| B | December 31, 1957 | Addison Miller Co. |
| C | do | Do. |
| D | do | Do. |
| E | February 14, 1958 | Do. |
| F | December 31, 1958 | Railroad. |
| G | do | Addison Miller Co. |
| H | do | Do. |
| I | April 21, 1958 | Jointly. |
| J | December 31, 1958 | Railroad. |
| K | do | Do. |

A. T. Miller, doing business as Addison Miller Co., discontinued operations in 1958.

Great Northern Icing Co. was liquidated about 1955; Addison Miller, Inc. (Minnesota corporation), and Addison Miller, Inc. (Illinois corporation), were liquidated in 1957.

Respondent determined in his statutory notice of deficiency that the administration of the estate of Addison Miller was terminated sometime prior to 1956 and therefore included the income of the estate, as well as other adjustments, in petitioner's income for the years 1956 and 1957. Respondent disallowed a deduction of $170,740.76 claimed by petitioner for the year 1958 as "Loss on Goodwill" attributable to the cessation by petitioner of the business operations of Addison Miller Co. Respondent also disallowed a deduction of $1,058.18 claimed by petitioner in his 1958 return for expenditures at various clubs.

### OPINION.

The first issue is whether, as respondent argues, the administration of the estate of Addison Miller should have been terminated sometime prior to 1956, in which event the income reported by the estate in the years 1956 and 1957 would be includable in the petitioner's income for those years. In support of his argument the respondent relies on section 1.641(b)–3, Income Tax Regs., which this Court has sustained as valid and reasonable.[1] *Edwin M. Petersen*, 35 T.C. 962. In the

---

[1] SEC. 1.641(b)–3. Termination of estates and trusts.

(a) The income of an estate of a deceased person is that which is received by the estate during the period of administration or settlement. The period of administration or settlement is the period actually required by the administrator or executor to perform the ordinary duties of administration, such as the collection of assets and the payment of debts, taxes, legacies, and bequests, whether the period required is longer or shorter than the period specified under the applicable local law for the settlement of estates. For example, where an executor who is also named as trustee under a will fails to obtain his discharge as executor, the period of administration continues only until the duties of administration are complete and he actually assumes his duties as trustee, whether or not pursuant to a court order. However, the period of administration of an estate cannot be unduly prolonged. If the administration of an estate is unreasonably prolonged, the estate is considered terminated for Federal income tax purposes after the expiration of a

*Petersen* case the Court stated that "The essence of that regulation is that, for Federal income tax purposes, the duration of the administration of an estate is the period actually required by the executor or administrator using reasonable diligence, to perform the ordinary duties of administration, whether or not this period coincides with the duration of the estate as determined by State law." Petitioner recognizes the rule that the "continuation of administration long after an estate should have been closed and the use thereof as a means of splitting income will not be condoned" but argues that the administration of the estate here was completed as soon as reasonably possible and that it should be regarded as a continuing tax entity in the years 1956 and 1957.

The ordinary duties of the administration of an estate are, generally, the collection of assets and the payment of debts and legacies. It is the time reasonably required to perform these ordinary *administrative* duties that is controlling, and as we pointed out in *Joseph M. Roebling*, 18 T.C. 788, "An executor cannot extend the period of administration by engaging in activities which are not part of his administrative duties. * * * The criterion, as we see it, is not as petitioners contend, analogous to the 'business purpose' test but is an 'administrative purpose' test."

Petitioner was sole heir and executor under decedent's will. In such an estate the executor is spared the necessity of annual and final accounting and settlement, distribution, and closing of the estate is rendered simple. This estate remained open for over 12 years with the result that Addison Miller Co.'s income was each year split between petitioner as executor and petitioner as a partner. Distribution would change Addison Miller Co. to petitioner's sole proprietorship with all income taxable to him. However, there was some justification for keeping the estate open beyond the ordinary period of administration. During these years the executor was engaged in controversies and litigation involving the estate's liability for Federal estate and income taxes and State (Minnesota) taxes. This all ended before July of 1954. It is true that also during these years the Addison Miller Co. was engaged in litigation with the U.S. Department of Labor but this apparently ended in 1945. Also during these years the Addison Miller Co. might be said to have had a contingent liability in the Stintzi litigation. This was settled, without liability to the Addison Miller Co., in September of 1955. Even if it be thought the estate should remain open until the litigation involving Addison Miller Co. (not the estate) was terminated, and we need not decide that issue, it surely

reasonable period for the performance by the executor of all the duties of administration. Further, an estate will be considered as terminated when all the assets have been distributed except for a reasonable amount which is set aside in good faith for the payment of unascertained or contingent liabilities and expenses (not including a claim by a beneficiary in the capacity of beneficiary).

should have been closed within a reasonable time after that litigation was all ended in September of 1955. All that respondent's determination seeks to tax to petitioner is the income reported by the estate for 1956 and 1957.

The record does not show that any *administrative* duties remained which would have made it reasonable for petitioner, as executor, to prolong the administration of the estate beyond 1955 to the middle of 1957. Petitioner has the burden to show that such valid and compelling reasons existed to prolong the administration. There certainly was no reason for the estate to remain open in 1956 and 1957 to continue as partner in Addison Miller Co. The partnership duties (such as they were) performed by petitioner in his capacity as executor could just as easily have been performed by petitioner himself. See *Marin Caratan*, 14 T.C. 934. There was nothing in the contracts that the partnership had with the railroads that made the partnership essential, and in fact some of these contracts were transferred with great facility in 1957 to petitioner, individually, doing business as Addison Miller Co.

Petitioner calls our attention to the fact that the estate, in addition to being a partner in Addison Miller Co., also owned a majority of the stock in four other corporations. We fail to see the relevance of this since there was nothing to prevent the estate from distributing the stock to petitioner prior to 1956. See *Joseph M. Roebling, supra; Alma Williams*, 16 T.C. 893; *William C. Chick*, 7 T.C. 1414, affd. 166 F. 2d 337.

Great Northern Icing Co., one of the four corporations, was liquidated in 1955. Addison Miller, Inc. (Minnesota corporation), and Addison Miller, Inc. (Illinois corporation), were liquidated in 1957 and prior to that the petitioner had requested a tax audit of the two corporations which was completed toward the end of 1956. Petitioner seems to argue these events required that the estate remain open. As we have indicated above, these events in 1956 and 1957 could just as easily have taken place after the stock was distributed by the estate. It was not necessary to hold the estate open until the corporations were audited and liquidated. Such delay would certainly not be a part of the normal administrative duties of an executor. Nor was there any reason to hold the estate open until February 8, 1957, when a State tax dispute involving the Minnesota corporation was finally adjudicated by the State courts. This was a corporate matter, not an estate matter.

There is no merit to the contention that delay was caused by the fact that the original attorney for the estate died and a new attorney appointed. The original attorney died in 1954 and there is nothing to indicate that the new attorney required time beyond the end of 1955 to become acquainted with the estate. Moreover, we have examined

the correspondence between the Florida attorney and representatives of the estate in Minnesota and we do not think it supports petitioner's contention on brief that these geographical distances contributed appreciably to any delay in closing the estate. In fact, the correspondence certainly indicates that there was a delay but that such delay all occurred in Minnesota. On May 23, 1956, the Florida attorney wrote to representatives of the estate in Minnesota outlining the procedure for closing the estate under Florida law, and some 9 months later (February 9, 1957) again wrote to express his concern that "I have not heard from you since my letter outlining the procedure and I have been worried for fear that you are waiting for me to do something else, which I do not understand."

Petitioner also mentions other "incidental" matters which caused delay beyond the end of 1955, such as the completion of ancillary probate proceedings in Washington in 1957 and the refund of payroll taxes received in December 1956 by the Illinois Central Railroad. A portion of this refund was payable to employees of Addison Miller Co., and the railroad company made the computation of the net tax refund due each employee. No reason existed for prolonging the administration of the estate of Addison Miller for this purely ministerial chore which really concerned only the employees of the partnership. Nor can we perceive any justification for prolonging the estate administration until the completion of the various ancillary proceedings in 1957 and subsequent years. See *Estate of J. F. Hargis*, 19 T.C. 842. Indeed, it appears that the ancillary proceedings in Montana still remained open at the time of trial, and it is plain that this would not justify keeping the estate open until 1962. Petitioner found the open ancillary estate in Montana no obstacle to his closing the Florida estate in 1957.

It is also of some significance, in deciding the reasonableness of the duration of the administration of the estate, that a Florida statute permitted a sole beneficiary to waive annual and final accountings. The expeditious procedure was adopted in this case when the estate was actually closed early in 1957 and it is revealing that a little more than a month elapsed between the date that the estate representative in Minnesota mailed to the Florida attorney the "Waiver and Consent" and "Petition for Order of Distribution and Discharge of Executor" and the issuance by the Court of the County Judge in Florida of the order waiving annual and final accounting and directing distribution. We should also add at this point that the order of the Court of the County Judge in 1945 empowering the estate to continue as partner in the business of Addison Miller Co. certainly cannot, under these facts, be interpreted to mean that it was reasonable to prolong the estate administration until 1957. It cannot preclude this Court, in

deciding the issue of reasonableness, from examining the other evidence before us.

We find that the record presents no basis for extending the administration of the estate of Addison Miller beyond the year 1955 and therefore conclude that the period of administration for the purpose of this case terminated in the year 1955. We hold that the income reported by the estate in the years of 1956 and a portion of the year 1957 is properly includable in petitioner's income for those years.

The next issue is whether petitioner is entitled to a deduction in 1958 of $170,740.76 which purportedly represents a loss of goodwill incurred by him when the railroad contracts were canceled in that year and he ceased operations of Addison Miller Co. (a sole proprietorship at that time). We have examined petitioner's arguments under this issue and find them to be completely without merit.

Petitioner's arguments are more difficult to state than to refute. Essentially, petitioner argues that the decedent's 55-percent interest in the partnership (Addison Miller Co.) was included in his estate at a value of $268,095.76 and that this became the "cost basis" of such interest; that "The difference between this cost and the value of the assets underlying [decedent's] 55% interest (the liquidating value of said 55% interest) therefore became goodwill in the hands of the Estate"; that the books and records of the partnership as of the date of decedent's death (September 7, 1944) showed the "liquidating value" of his 55-percent interest to be zero "so that a goodwill item of $268,095.76 was created"; that this goodwill item passed into petitioner's hands as sole heir when the estate was closed in 1957; and that when the railroad contracts under which petitioner was by then doing business as Addison Miller Co. were canceled in 1958 he sustained a loss in that year (in which he ceased business operations) measured by his basis in the goodwill item. On brief he argues that even if certain adjustments are made in the value of partnership assets as of September 7, 1944, the value of goodwill would still be in excess of $170,740.76.

The value of decedent's 55-percent partnership interest had originally been included in the Federal estate tax return at $4,560.45. This and other items were disputed by respondent and in 1954 a settlement of estate tax liability was reached by the parties, and as part of such settlement the fair market value of the decedent's 55-percent partnership interest was determined to be $175,301.21. Thus, at the very outset we perceive that the figure of $268,095.76 used by petitioner as a "cost basis" of the good will item is contrary to the facts as they appear in the record. Petitioner argues that the amount in decedent's partnership drawing account on September 7, 1944, in the amount of $92,794.55, was erroneously listed on the estate tax returns as one of

decedent's assets, in addition to the value of his 55-percent partnership interest, and that this erroneously included item should be added to the established fair market value of the 55-percent partnership interest to increase that fair market value to $268,095.76. Both the statute and the regulations make it abundantly clear that property or interests of a decedent are to be included in his estate at their fair market value at the time of his death. (Sec. 811, I.R.C. 1939; Regs. 105, sec. 81.10.) The basis of property acquired by bequest, devise, or inheritance, or by a decedent's estate from the decedent "shall be the fair market value of such property at the time of such acquisition." (Sec. 113(a) (5), I.R.C. 1939.) Petitioner has not shown that the fair market value of the 55-percent partnership interest was other than $175,301.21. Certainly the fair market value of an interest cannot be arbitrarily increased by an item erroneously included in the estate tax return.

Moreover, it is inconceivable that, as petitioner argues, the "liquidating value" of the 55-percent partnership interest at the date of decedent's death was zero and that the entire fair market value of the interest was attributable to goodwill. First, the books and records of the partnership do *not* show a zero valuation. The partnership performed its services to the railroads mostly under cost-plus contracts, with monthly billings and yearend adjustments of all costs and expenditures. In 1944 the partnership earned a net profit of $210,375.87 and the record shows that the portion allocable to the period ending September 7, 1944, was $144,274.16. Petitioner, in reaching his zero valuation would have us ignore this latter amount. In addition, there was a reserve for contingencies on the books in the amount of $23,000.[2] It can readily be seen that decedent's 55-percent share of the $144,-274.16 and the $23,000 contingency account would amount to about $92,000, and if we add to this the amount in decedent's drawing account, or $92,794.55, then the "liquidating value" of the decedent's 55-percent partnership interest as of the date of his death would be about $184,000.

Second, the petitioner has not even attempted to demonstrate, apart from the mathematics involved, that the partnership even possessed goodwill on September 7, 1944. One does not ordinarily think of goodwill attaching to a business that engages in the business of performing a dozen short-term service contracts. No goodwill account appeared on the partnership books, and it would not seem from the nature of the partnership business that goodwill existed or was of particular importance. The partnership performed services for railroads under contracts cancellable on rather short notice. The services

---

[2] The partnership, as of Sept. 7, 1944, showed cash in the amount of $23,233.32, receivables of $1,012,631.50, and a total of assets amounting to $1,187,123.71. There were payables of $650,755.71 and an intercompany account of $318,172.72, for a total of liabilities in the amount of $968,928.43.

were to furnish railroad boarding camps with meals and lodging, to operate retail concessions, to manufacture, harvest, and handle ice, to ice and clean railroad cars, to operate coal docks, and similar operations. Absent any further evidence, we cannot say that service operations of this nature indicate the presence of goodwill. Moreover, it appears that the partnership's contracts were limited to about seven railroads, that some of the contracts went back to 1936 and 1938, and that one of these contracts in later years accounted for more than half of the partnership business. The business of the partnership appears to have been profitable, but it is established that high earnings do not by themselves constitute goodwill. *Donal A. Carty*, 38 T.C. 46; *Estate of Henry A. Maddock*, 16 T.C. 324; *Estate of Leopold Kaffie*, 44 B.T.A. 843. Such earnings may be caused by the efforts of the partners, the exercise of business judgment, favorable contracts, or to fortuitous circumstances unrelated to goodwill. See *Estate of Henry A. Maddock, supra.*

There is no merit to petitioner's conclusion that existence of goodwill may be "reached by another route", namely by use of the partnership sections in the Internal Revenue Code of 1954. Petitioner touches upon sections 705, 731, 732, 734, 742, 743, 752, 754, and 755. We have carefully examined this phase of his argument and it will suffice to say that the sections relied upon do not support the existence of goodwill.

Petitioner on brief also makes an argument that the doctrine of equitable recoupment should be applied here to enable petitioner to recoup the additional estate tax paid through the erroneous inclusion among the decedent's assets of the $92,794.55 which was in his partnership capital account at the time of his death.

This Court is without equity jurisdiction. *Lorain Avenue Clinic*, 31 T.C. 141. The Supreme Court, in *Rothensies* v. *Electric Storage Battery Co.*, 329 U.S. 296, has held that the Tax Court has no jurisdiction to consider recoupment.

We find that petitioner has failed to establish the existence of goodwill in the partnership as of September 7, 1944, and that consequently no such item was acquired by him at any time. We hold that petitioner is not entitled to a deduction of $170,740.76, or any other amount, attributable to the loss of goodwill in 1958.[3]

The last issue is whether petitioner is entitled to a business expense deduction of $1,058.18 in 1958 which represents expenditures at the Minnesota Club, Somerset Club, and the Chicago Club. The peti-

---

[3] It appears that the figure of $170,740.76 represents the difference between the amount of $4,560.45, which was the valuation originally given in the estate tax return to the decedent's 55-percent interest in the partnership, and $175,301.21, the valuation which formed the basis of the settlement of the estate tax liability in 1954. It is exactly this difference which petitioner is attempting to label as goodwill and this appears in paragraph 6 of his petition in Docket No. 91439.

tioner has the burden to show that this amount or some portion of it, was an ordinary and necessary business expense under section 162, I.R.C. 1954. Petitioner has failed to meet his burden. We have only the testimony of petitioner's employee, Buckley, on this point, and the testimony is brief and couched in very broad generalities. He testified that in his opinion these "were necessary expenses" and that "those are clubs where businessmen get together and exchange ideas, negotiate work and so forth." It appears that these expenditures were, in fact, annual membership dues at these clubs and that the clubs were used for social purposes. We cannot, on the basis of the meager evidence, find that any portion of the club expenditures was ordinary and necessary business expenses. We sustain respondent on this issue.

*Decisions will be entered under Rule 50.*