Estate of Leonidas C. Papson, Deceased, Costa L. Papson, Executor, Petitioner v. Commissioner of Internal Revenue, Respondent

Docket No. 10249–76.     Filed November 20, 1979.

*Costa L. Papson,* for the petitioner.

*H. Stephen Kesselman* and *Joan Ronder Domike,* for the respondent.

TANNENWALD, *Judge:* Respondent determined a deficiency in petitioner's estate tax of $452,632.31. Concessions having been made by both parties, the issue remaining for our resolution is whether the broker's commission of $109,708.95 incurred in the leasing of a store in the shopping center property, included in and constituting more than 35 percent of the value of the gross estate, to replace the primary tenant qualifies as an expense of administration.

### FINDINGS OF FACT

All of the facts were stipulated. The stipulation of facts, together with the exhibits attached thereto, is incorporated herein by this reference.

Decedent Leonidas C. Papson died testate on July 2, 1973. At his death, he resided in Manhasset, N.Y. His last will and testament, dated February 14, 1972, was admitted into probate in the Surrogate's Court of Nassau County, N.Y., on July 20, 1973. Petitioner (the estate), whose legal address when this petition was filed was in New York City, filed its Federal estate tax return with the Office of the Internal Revenue Service at Mineola, N.Y., on March 13, 1974.

At his death, decedent was the sole proprietor of the Riverhead Plaza Shopping Center, located in Riverhead, N.Y., and was doing business there as West Side Realty Co.

Petitioner elected to have the gross estate valued as of the

alternate valuation date of January 2, 1974. On the alternate valuation date, the fair market value of the shopping center was $2,311,320, and the property was subject to mortgages in the amount of $1,120,038.67. The value of this property was in excess of 35 percent of decedent's gross estate. Petitioner validly elected to pay the estate tax under the installment method of section 6166.[1]

Decedent's will names his son, Costa L. Papson (hereinafter sometimes Papson), executor and trustee. The will directed the executor to set aside approximately $66,000 for specific bequests, bequeathed his personal property to his two children, and specifically devised other property not here relevant. The residuary estate, whose primary asset was the shopping center, was divided into two equal parts: one-half for his son and the other half to be held in a spendthrift trust for his daughter. Paragraph First of the will directed that all inheritance, estate, transfer, and similar taxes were to be paid out of the residuary estate. Paragraph Eighth(d), which disposed of the residuary estate, gave discretionary authority to the trustee to pay the deferred taxes and interest allocable to this portion of the estate from the income of the trust if he deemed such action advantageous to the trust beneficiaries. The trust was to terminate upon full payment of all estate taxes and administration costs incurred by the estate and allocated to the trust.[2]

Insofar as pertinent, the will gave the executor and trustee the following powers:

ELEVENTH: I hereby authorize and empower my Executor and Trustee to take *any action deemed by them, in their sole discretion, necessary for the handling and management of my estate and/or the trusts* (sic) *created hereunder and the assets or liabilities comprising same to the same extent as I personally could act in the handling of said assets and liabilities were I alive and in sole possession and ownership thereof, said authority to be without any restriction or limitation whatsoever, except that of acting in good faith for the benefit of the beneficiaries of my estate.* This power and authority is intended to include all rights customarily given executors and trustees either by private document or the provisions of law, including but not limited to the right to retain, change, sell, invest and reinvest, *lease* or borrow against investments or other property, whether or not such be of the class in which trustees are

---

[1] All section references, unless otherwise indicated, are to the Internal Revenue Code of 1954, as amended and in effect at the time of death.

[2] The trust also terminated upon the deaths of decedent's daughter and of her issue living at the time of decedent's death if that should occur prior to the conditions set forth in the text.

authorized by law to invest trust funds * * * ; carry out agreements; *continue any business;* employ agents, attorneys * * * . My Executor and Trustee may freely act under all or any of the powers hereby given to them, in such manner as in their sole discretion seems proper without the necessity of the approval or consent of any person * * * or court and despite whatever interests they might have either individually or as agents for another and all actions undertaken by them, together with the advisability thereof, shall be final and conclusive upon all parties interested in or who may become interested in my estate or the trusts created hereunder. [Emphasis added.]

Petitioner continued the business of West Side Realty Co., filing a business certificate with the Clerk of Suffolk County, N.Y., on August 7, 1973.

The shopping center included facilities for 18 tenants with building space of 196,000 square feet. On both July 2, 1973, and January 2, 1974, the principal tenant in the shopping center was W. T. Grant Co. (hereinafter Grant), which occupied 128,000 square feet. Grant's lease was to run until January 31, 1981, with options to extend it. At the date of death, the annual total base rent for all tenants of the shopping center was $362,000, of which Grant paid $196,300. The real estate taxes on the shopping center for the calendar year 1976 were $145,599, of which Grant was to have paid (pursuant to its lease) $93,564, in addition to its aforementioned rent.

During October 1975, Grant voluntarily instituted chapter 11 proceedings under the Bankruptcy Act. Subsequent to October 1975, Grant was adjudicated bankrupt. Because of its bankruptcy, Grant vacated the Riverhead Plaza Shopping Center on April 1, 1976.

On February 18, 1976, petitioner engaged Huberth & Huberth (hereinafter Huberth), a New York real estate concern, as its exclusive rental agent to obtain a tenant for the space left vacant by Grant. In March of that year, petitioner applied for a deferment in the payment of the then-current installment of estate tax, due on April 2, on the ground of extreme hardship brought about by the Grant bankruptcy. The extension was granted by respondent on April 6, 1976. In March 1976, petitioner also applied for a 3-month moratorium on the payment of principal on the first mortgage on the shopping center property due to the Grant bankruptcy. Queens County Savings Bank, the mortgagee, granted this request, as well as subsequent moratorium extensions deferring both principal and interest through April 1977.

Huberth succeeded in obtaining a tenant for the vacant store; a lease was executed by the estate, doing business as West Side Realty Co., with the F. W. Woolworth Co. on October 1, 1976. Woolworth occupied the site on April 1, 1977, and commenced paying rent on that date. The lease, calling for a minimum annual rental of $307,308 (including real estate taxes subject to indexing), had an initial term until January 31, 1993, with four options to renew for successive 5-year terms. As a result of the execution of this lease, Huberth became entitled to a commission of $109,708.95.[3]

During petitioner's fiscal year, June 1, 1976, to May 31, 1977, its gross rents and royalties collected totaled $212,944.19. Its operating costs were $103,397.75, interest paid was $32,906.08, and various taxes, including real estate tax payments on the shopping center, totaled $126,510.79. Petitioner also had dividend income of $1,731.25 and interest income of $6,108.45 that year.

## ULTIMATE FINDING OF FACT

The broker's leasing commission incurred in the letting of the premises formerly occupied by Grant to Woolworth qualifies as an expense of administration in the amount of $109,708.95.

## OPINION

The issue for decision is whether the broker's commission incurred in replacing the tenant of the primary store in a shopping center property included in, and constituting more than 35 percent of the value of, the gross estate, qualifies as a deductible administration expense under section 2053(a).[4]

---

[3]The commission was calculated as follows:

| Year | Rental | Commission rate | Gross commission |
|---|---|---|---|
| 1 | $307,308 | 5% | $15,365.40 |
| 2 | 307,308 | 4% | 12,292.32 |
| 3–5 | 921,924 | 3% | 27,657.72 |
| 6–15 | 3,073,080 | 2% | 61,461.60 |
| Remaining 10 months | 256,090 | 2% | 5,121.80 |
| Total | | | 121,898.84 |

Petitioner agreed to pay 90 percent of the commission rate: $109,708.95
The payments were due in five installments.

[4]SEC. 2053. EXPENSES, INDEBTEDNESS, AND TAXES.

(a) GENERAL RULE.—For purposes of the tax imposed by section 2001, the value of the taxable estate shall be determined by deducting from the value of the gross estate such amounts—

Respondent has advanced a variety of arguments, many of them based upon New York law, to sustain his position that his disallowance of the deduction in question should be sustained.

One such argument is based upon the proposition that the broker's commission is not a deductible administration expense because the shopping center belonged to residuary beneficiaries rather than the estate and the expense was therefore incurred for their benefit. Cf. *Estate of Smith v. Commissioner*, 57 T.C. 650, 661 (1972), affd. 510 F.2d 479 (2d Cir. 1975), cert. denied 423 U.S. 827 (1975); sec. 20.2053–3(a), Estate Tax Regs. Respondent asserts that, under New York law, title to undevised real property passes directly to the residuary beneficiaries and the executor, as such, does not "receive" it. Irrespective of the reach of the cases relied upon by respondent, they dealt with the situation which existed before changes made in New York law and, in our opinion, are not relevant to the instant case. The New York Estates, Powers & Trusts Law was substantially revised in 1966 and by subsequent amendment in 1967, especially section 11–1.1(b)(5). Those revisions eliminated the distinction previously drawn between personal property and real property not specifically devised, for purposes of management, lease, sale, and mortgage and extended to executors the power to take possession of and to manage, lease, sell, and mortgage real property in order to satisfy the obligations of an estate—powers which had long existed with respect to personal property not specifically bequeathed. See S. Hoffman, "Practice Commentary" to secs. 11–1.1(b)(5) and 13–1.3, N.Y. Est., Powers & Trusts Law (McKinney 1967), and "Reviser's Notes" to sec. 11–1.1(b)(5) (McKinney 1967). See also *Blood v. Kane*, 130 N.Y. 514, 29 N.E. 994 (1892). The 3-year statutory limitation on leasing by an executor (see sec. 11–1.1(b)(5)(C), N.Y. Est., Powers & Trusts Law) applies only in the absence of a contrary limitation in the will. See S. Hoffman, "Practice Commentaries" to sec. 11–1.1, N.Y. Est., Powers & Trusts Law (McKinney 1967). The decedent's will, however, in the paragraph set forth in the findings of

---

\*  \*  \*  \*  \*  \*  \*

(2) for administration expenses,

\*  \*  \*  \*  \*  \*  \*

as are allowable by the laws of the jurisdiction, whether within or without the United States, under which the estate is being administered.

fact (p. 291 *supra*) grants the executor virtually unlimited power and discretion in managing the estate and its assets. This language is clearly sufficient to remove the 3-year statutory limitation.

Respondent also points to N.Y. Estates, Powers & Trusts Law section 11–2.1(c)(1), which states that a testamentary trust asset becomes subject to the trust as of the date of the testator-grantor's death, though there is an intervening period of estate administration. His reliance on this section is misplaced. It is primarily concerned with the allocation of income from trust assets, not with the allocation of assets to the trust. There is no dispute herein that half the income from the shopping center will be trust income from the date of the testator's death.

Respondent notes also that the residuary beneficiaries are entitled to the rent from the decedent's real property, not specifically disposed of, from the date of death. N.Y. Est., Powers & Trusts Law sec. 11–2.1(d)(3)(A). This, too, however, does not negate the executor's control in managing the property; it only deals with the fruits of those efforts.

Respondent further argues that decedent's will, in stating that the only restriction to be placed on the executor is that of "acting in good faith for the benefit of the beneficiaries of my estate," proves that Papson acted for the beneficiaries and not the estate. We believe that this interpretation goes too far. Initially, we note that this issue only arises if the expenditure is "not essential to the proper settlement of the estate" (sec. 20.2053–3(a), Estate Tax Regs.). As will subsequently appear, we believe that, in the instant situation, the executor's action had the requisite degree of essentiality; that the beneficiaries also benefited as well is an expected indirect consequence and does not necessarily defeat the deduction.

We think there is no question that the executor took possession of the shopping center and therefore had the power under New York law to manage it (including the power to lease) whether he held title in his capacity of (a) executor or (b) trustee and individually stemming from his status as residuary legatee. Cf. Rev. Rul. 76–498, 1976–2 C.B. 199.

We are not unaware that, in the instant case, the power of management, etc., was given in the decedent's will to both the executor and trustee and that, in this case, the same person, namely, Papson, was designated to act in both capacities as well

as being designated individually as a residuary beneficiary. Under these circumstances, the controlling fact is, in which capacity did Papson execute the lease. *Estate of Streeter v. Commissioner*, 491 F.2d 375 (3d Cir. 1974), affg. T.C. Memo. 1971-260. See also *Estate of Vatter v. Commissioner*, 65 T.C. 633, 638 (1975), affd. without opinion 556 F.2d 563 (2d Cir. 1976).

We hold that Papson was acting as executor when he signed the Woolworth lease. He was still filing estate income tax returns after Woolworth had commenced operations in the shopping center. The period of administration was not unduly prolonged under respondent's regulations (sec. 1.641(b)-3(a), Income Tax Regs.) and, in any event, respondent has not contended otherwise. As executor, he was justified in keeping the estate open while engaged in controversies involving Federal estate taxes.[5] *Miller v. Commissioner*, 39 T.C. 940 (1963), affd. 333 F.2d 400 (8th Cir. 1964). These taxes were to be paid from the residuary estate, of which the shopping center was the dominant asset, thereby explaining why it had not been distributed from the estate.[6] Thus, the brokerage commission may properly be considered as having arisen during the period of administration. See generally 1 A. Scott, Trusts 56-59 (3d ed. 1967); 1 Restatement, Trusts 2d, sec. 6(b) (1959).

Respondent argues that, under New York law, petitioner was without authority to continue decedent's business, represented by the shopping center. We find it unnecessary to delve into the question of whether or where the line should be drawn, in respect of the existence of a business in the case of estates, between an ongoing business (for example, where the manufacture and/or sale of products is involved) and the management of a large parcel of real estate constituting a shopping center. Paragraph Eleventh of the decedent's will (see p. 291 *supra*) clearly authorized the continuing operation of West Side Realty Co. and renders inapplicable the general rule in New York that death terminates a trade or business of a decedent and that, absent a direction in the will, the executor has no authority to

---

[5]At the time petitioner received its notice of deficiency, it had not yet executed the lease with Woolworth. Its original and amended petition involved other issues; the commission expense was not claimed until the petition was amended. The other issues were settled prior to trial.

[6]We do not consider that the provision granting the discretionary authority to the trustee of the residuary trust to pay deferred taxes and interest from the income of the residuary trust should prevail over the specific direction in paragraph First of the will to pay such taxes out of the "residuary estate."

continue a business except for the temporary purpose of converting its assets into cash. *In re Estate of Muller*, 24 N.Y.2d 336, 340, 300 N.Y.S.2d 341, 343 (1969); *Estate of Begent v. United States*, 37 App. Div. 2d 310, 325 N.Y.S.2d 317 (3d Dept. 1971). *In re Kitzes' Estate*, 109 N.Y.S.2d 673 (Queens County Surr. Ct. 1951); *In re Wolf's Estate*, 87 N.Y.S.2d 327 (New York County Surr. Ct. 1943).

There appears to be no question but that, if the shopping center had been sold, any broker's commission payable with respect to the sale would have been deductible as an administration expense in view of the key position of the shopping center in the aggregate value of the gross estate and the estate tax liability involved. N.Y. Est., Powers & Trusts Law secs. 11–1.1(b)(5) and 13–1.3(a)(1) (McKinney 1967); *Estate of Vatter v. Commissioner, supra; Estate of Sternberger v. Commissioner*, 18 T.C. 836 (1952), affd. 207 F.2d 600 (2d Cir. 1953), revd. on other grounds 348 U.S. 187 (1955); *In re Saphir's Estate*, 73 Misc. 2d 907, 343 N.Y.S.2d 20 (Kings County Surr. Ct. 1973). We see no reason why a New York court would find differently as to a lease, and we do not accept respondent's argument that, merely because there appear to be no New York cases on the point, petitioner must lose on this issue. The executor herein was empowered to manage the leased property. N.Y. Est., Powers & Trusts Law sec. 11–1.1(b)(5)(A) and (C).

We disagree with respondent's contention that the leasing commission was unnecessary to the proper settlement of the estate because it was not directly related to paying the estate tax.[7] Rather, petitioner's leasing expense was incurred to ensure that the shopping center generated the income that made it possible to pay taxes. In so arguing, respondent appears to ignore petitioner's election to pay taxes under the deferral method pursuant to section 6166. The purpose of this section is to enable the heirs to pay the estate tax out of the earnings of the

---

[7]Respondent contends that the estate had adequate personal property assets which could be liquidated in order to pay estate tax installments. Out of those assets ($345,000), however, the specific legacies (approximately $66,000), funeral expenses ($2,300), executor's commissions ($74,000), and legal ($70,000) and accounting ($15,000) fees were to be paid. Also, the $50,000 in life insurance which respondent included in these liquid assets was not available in full to the estate to pay taxes in view of the fact that the proceeds were not payable to the executor (in his capacity as such) and of the direction in the will to pay taxes from the residuary estate. If we then consider the negative cash flow of the estate during the year the store was vacant, the necessity for the lease in order to pay the estate tax becomes obvious.

business, rather than upsetting the business' operation. H. Rept. 2198, 85th Cong., 2d Sess. (1958). Respondent earlier had recognized petitioner's precarious position when he granted the extension of time to pay the 1976 installment of the estate taxes, pursuant to section 6161(a).

In leasing the empty store to Woolworth, petitioner facilitated the proper settlement of the estate and probably expedited the payment of the estate tax. Had the property been sold or the mortgage foreclosed, the business would not have continued as far as the estate was concerned, the deferral of estate taxes would have ceased to apply, and the balance of the taxes would have been due and payable upon notice and demand by respondent. (Sec. 6166(h)(1).) In addition, any delays in payment would have been subject to interest at the higher rate determined under section 6621, pursuant to section 6601(a). Moreover, had the executor not taken action to lease the Grant premises, the shopping center would have had to have been sold at a price substantially less than the value for estate tax purposes or the mortgagee allowed to foreclose. It does not require much imagination to visualize the devastating effect on value which the vacancy of such a large part of the premises would have had. In this context, respondent's position that foreclosure or sale of the property would not have affected the net value of the estate borders upon the ludicrous. The foregoing consequences would have been in direct contradiction to the clearly stated legislative preference, through the enactment of section 6166,[8] namely, that closely held businesses should be continued so that the estate taxes can be paid from their income, rather than forcing the disposition of those interests.

By this analysis, we are not suggesting that an estate can necessarily bootstrap itself into a deductible administration expense by electing to defer the payment of estate taxes. But, given the exceptional circumstances herein, where not only did the asset involved represent a very large proportion of the estate but also the tenant occupied such a significant portion of the premises, and its occupancy was so abruptly and unexpectedly

[8]Sec. 6166 was renumbered 6166A by sec. 2004(a) of the Tax Reform Act of 1976, Pub. L. 94–455, 90 Stat. 1525, 1862, and a new sec. 6166 was adopted. The new sec. 6166 permits a 5-year period during which no taxes are due and the interest rate is only 4 percent. The taxes may be paid in installments over a 10-year period, following the 5-year deferral, with the 4 percent interest rate continuing, provided the value of the closely held business exceeds 65 percent of the adjusted gross estate.

terminated, we think that the lease (and therefore the broker's commission) was necessary in order to preserve the estate.

In sum, we hold that the brokerage commission involved herein was a "necessary" expenditure within the meaning of section 20.2053–3(a) and (d)(2), Estate Tax Regs. Cf. *Estate of Bahr v. Commissioner*, 68 T.C. 74 (1977); *Estate of Todd v. Commissioner*, 57 T.C. 288 (1971).[9]

Respondent argues that, even if the expenditure was necessary for preserving the estate, it should not be allowed because the regulations exclude "outlays for additions or improvements" and deny the allowance of expenses "for a longer period than the executor is reasonably required to retain the property." Sec. 20.2053–3(d)(1), Estate Tax Regs. Whether the commission would be a capital expenditure for income tax purposes is not relevant to the problem before us. In this connection, we note that, irrespective of the "capital expenditure" rationale for requiring, for income tax purposes, the amortization of the brokerage expenses in obtaining leases, there is realistically no *addition* or *improvement* involved in such expense.[10] In any event, we regard the lease involved herein, not as an improve-

------

[9]It appears that, under New York law, the commission would not have to be "necessary," within the meaning of those regulations, in order to be an allowable administration expense. *In re Saphir's Estate*, 73 Misc. 2d 907, 343 N.Y.S.2d 20 (Kings County Surr. Ct. 1973). By finding that the commission incurred was necessary, we need not rule on the validity of sec. 20.2053–3(a) and (d)(2), Estate Tax Regs. There is a conflict in the courts over the deductibility from the gross estate of expenses allowable as administration expenses under State law. One line of cases holds that State law is determinative of whether an expense is allowable, and therefore deductible, as an administration expense. E.g., *Estate of Park v. Commissioner*, 475 F.2d 673 (6th Cir. 1973), revg. 57 T.C. 705 (1972); *Ballance v. United States*, 347 F.2d 419 (7th Cir. 1965). The other line of cases requires the expense to qualify both under State law and under respondent's regulations which limit the deduction to necessary expenses. E.g., *Hibernia Bank v. United States*, 581 F.2d 741 (9th Cir. 1978); *Pitner v. United States*, 388 F.2d 651 (5th Cir. 1967); *Estate of Smith v. Commissioner*, 57 T.C. 650 (1972), affd. 510 F.2d 479 (2d Cir. 1975), cert. denied 423 U.S. 827 (1975).

The Second Circuit, to which an appeal would lie in this case, has refused to express a position on this conflict in *Estate of Smith v. Commissioner*, 510 F.2d at 483. There has been some dispute, however, as to whether that court implicitly took a stand in that case in favor of Federal law. See *Hibernia Bank v. United States*, 581 F.2d at 744–745, n. 5.

[10]The cases involving brokerage commissions paid by a lessor characterize such commissions as amortizable capital expenditures more in the context of the proper treatment of such commissions in order to match income and expenses, rather than in the context of an addition or improvement in the traditional sense. E.g., *Central Bank Block Assn. v. Commissioner*, 57 F.2d 5, 6 (5th Cir. 1932), affg. 19 B.T.A. 1183, 1185 (1930). In our opinion in that case, we stated at page 1185:

"the contention of the petitioner, that it is entitled to deduct from income of each year the amount of commission paid in such year as ordinary and necessary expense, is denied, and the expenditure should be treated as *in the nature of or analogous to a capital investment*. The acquisition of something from which income will be derived in the future has a value in money's worth. *It is property of a sort*. Its cost should be spread or amortized over the life of the lease contract in accordance with the factors which determine or affect the rate of exhaustion thereof. [Emphasis added; citations omitted.]"

ment, but more akin to maintenance—it merely restored the shopping center to its former position.

To be sure, the Woolworth lease does extend beyond the scheduled termination date of the Grant lease, the estate administration period, and the section 6166 period. The expense, therefore, could be construed as having value for a longer period than the executor might reasonably retain the property. But we do not think that this fact necessitates a denial of its deductibility as an administration expense. The expense was incurred, in fact, during the period of administration. In the world of estate taxation, we are not as concerned with taxable periods as we are with when taxing income.

Though the contract with Huberth calculated the commission based on percentages of each year's rent and could thereby (as a practical matter) be allocated, we believe such an allocation would essentially be arbitrary. The commission herein involved one transaction, that of replacing the large Grant store with a new tenant in order to wind up the estate.[11] In this respect, the commission differs from brokers' commissions paid in *Estate of Smith v. Commissioner, supra,* where we were able to segregate a series of transactions and allow the deduction of only those commissions necessary to the settlement of the estate and not those for the sales designed, but not necessary, to fund the testamentary trusts. We have also taken into account the contrast in views, occasionally reflected in the decided cases, as to whether the brokerage commission should be considered as an expense of "the business" deductible only for income tax purposes, or whether it should be considered as an administration expense deductible for estate tax purposes. See, e.g., *Adams v. Commissioner,* 110 F.2d 578 (8th Cir. 1940), revg. a Memorandum Opinion of this Court; *Estate of Hubbard v. Commissioner,* 26 T.C. 183 (1956), revd. on another issue 250 F.2d 492 (5th Cir. (1957); *Oldham v. Commissioner,* 36 B.T.A. 523 (1937).[12] Indeed, we hasten to note that the alternatives are not necessarily mutually exclusive because some types of expenses have been held to be deductible for income tax purposes as ordinary and

---

[11]If a commission on a short-term lease involving a minor portion of the property were involved, our view of its deductibility as an administration expense might well be different. But such is obviously not the factual setting herein.

[12]See also *Estate of Brewer v. Commissioner,* a Memorandum Opinion of this Court dated Dec. 26, 1941.

necessary expenses under section 162 or section 212 and also deductible as administration expenses; indeed, it was this so-called "double deduction" situation which caused Congress to enact section 162(e) of the Internal Revenue Code of 1939, a provision carried forward into section 642(g) of the present Code. See *Estate of Long v. Commissioner*, 71 T.C. 1 (1978).

We hold that, under the particular circumstances of this case, the entire broker's commission is deductible as an expense of administration under section 2053(a).

To reflect the foregoing and concessions made by the parties,

*Decision will be entered under Rule 155.*