*Decision will be entered under Rule 50.*

ESTATE OF DAVID SMITH, DECEASED, IRA M. LOWE, CLEMENT GREENBERG, ROBERT MOTHERWELL, COEXECUTORS, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4251–69. Filed February 23, 1972.

*Ira M. Lowe*, for the petitioner.
*St. Clair Reeves*, for the respondent.

TANNENWALD, *Judge:* Respondent determined a deficiency of $2,444,629.17 in the Federal estate tax of the Estate of David Smith (hereinafter referred to as Smith or decedent).

Several issues raised in the petition have been either resolved by agreement of the parties or abandoned by petitioner. The following issues remain for decision: (1) The fair market value of 425 sculptures

created by Smith and in his possession at the time of his death; and (2) the deductibility of certain commissions incurred and paid by petitioner in the course of selling some of the aforementioned sculptures.

Some of the facts have been stipulated and, together with the exhibits attached thereto, are incorporated herein by this reference.

David Smith died from injuries sustained in an automobile accident on May 23, 1965. He was a citizen of the United States and a resident of Bolton Landing, N.Y., at the time of his death. Robert Motherwell, Clement Greenberg, and Ira M. Lowe qualified as coexecutors of the decedent's estate. A Federal estate tax return was filed on August 24, 1966, with the district director of internal revenue in Albany, N.Y.; the property included therein was valued as of the date of decedent's death. A deficiency was agreed upon and paid on July 10, 1968. On August 7, 1969, respondent issued the notice of deficiency herein.

At his death, Smith owned 425 pieces of sculpture created during various periods of his life. Of these sculptures, 291 were located at Bolton Landing, N.Y.

Smith began making metal sculptures in 1937. Most of his work is of the abstract, nonrepresentational variety and fashioned out of welded steel and other metals, a technique which Smith pioneered. The quality of Smith's sculptures varied according to the period in his life during which they were created. From 1940 to 1963, Smith was represented by two art galleries who endeavored to sell his works, albeit without much success. Between 1940 and 1956, Smith was represented by the Willard Gallery, during which time 53 of his works were sold for $33,432.50 at prices ranging from $40 to $3,213. From 1957 until 1963, he was represented by the Otto Gerson Gallery, during which time 17 pieces were sold for $76,148.

On or about June 2, 1963, Smith and Marlborough-Gerson Galleries (Marlborough) entered into an agreement which provided in part, as follows:

The following shall constitute our agreement with respect to the sale by us of sculpture, drawings and graphics created by you (hereinafter referred to as "your work") :

1. During the period of 5 years commencing on the date hereof, we shall have the exclusive right, in any part of the world, to offer for sale and to authorize others to offer for sale all items of your work owned by you. You shall initially deliver each such item of your work to us at such location as we shall indicate.

2. During such period of 5 years, we shall also have the exclusive right to arrange and to authorize others to arrange the publication and/or sale, in any part of the world, of books and catalogues containing illustrated reproductions of your work.

3. During such period of 5 years, we shall arrange for exhibitions of your work in New York, London, Rome and such other places as you and we shall jointly determine. We shall be responsible for all of the expenses of such exhibitions (including advertising and catalogue costs) other than insurance and shall bear the entire cost of storing all items of your work delivered to us pursuant to this agreement.

4. You have furnished us with photographs of each item of your work owned by you on the date hereof. The price at which we shall offer each such item for sale shall not be less than the price set forth on the back of such photograph. We shall agree with you as to the minimum sale prices of those items of your work created in the future. Minimum prices may be changed from time to time in such manner as you and we shall jointly agree.

\*     \*     \*     \*     \*     \*     \*

6. Upon the sale by us of any item of your work, we shall reimburse ourselves from the actual net proceeds for any initial shipping cost and insurance cost advanced to you with respect to such item. In addition, as compensation for our services, we shall retain ⅓rd of the balance of such net proceeds. The remaining ⅔rds of such balance, less any amounts due to us hereunder, shall be paid to you in United States dollars on a quarterly basis.

\*     \*     \*     \*     \*     \*     \*

8. This agreement shall be construed in accordance with the laws of the State of New York and shall be binding upon and inure to the benefit of your and our respective executors, administrators, successors and assigns.

This contract was renewed by Smith's estate on June 3, 1968.

Smith's sculptures were mostly sold at retail to museums and individual collectors during his lifetime.

Between June 2, 1963, and Smith's death on May 23, 1965, Marlborough's efforts (which included an exhibition of 29 selected works at Marlborough's Gallery in New York in October of 1964) resulted in the following sales:

| Date | Pieces sold | Total sales price | Commissions | Artist |
|---|---|---|---|---|
| Nov. 20, 1963 | 1 | $6,000 | $2,000 | $4,000 |
| June 20, 1964 | 1 | 14,000 | 4,666 | 9,334 |
| Nov. 12, 1964 | 1 | 40,000 | 13,333 | 26,667 |
| Nov. 14, 1964 | 1 | 8,500 | 2,833 | 5,667 |
| Jan. 7, 1965 | 1 | 40,000 | 13,333 | 26,667 |

During the 2 years following Smith's death, Marlborough effected the following sales, presented below in summary fashion:

| Period | Number of works sold | Total sales price | Commissions | Artist |
|---|---|---|---|---|
| 5/23/65—5/23/66 | 16 | $269,383.00 | $89,795 | $179,588.00 |
| 5/24/66—5/31/67 | 52 | 718,951.67 | 240,264 | 478,687.67 |

During his lifetime and at the time of his death, several factors militated against Smith's becoming a commercially successful artist.

First, abstract sculptures attract far fewer buyers than do paintings, partly because the latter more easily fit into the decor of a buyer's household or of a museum. While Smith received mixed critical acclaim from his contemporaries and art critics, his work was not particularly appealing to the general public upon whom an artist must rely for the great bulk of his sales. Secondly, the size of his works (particularly those of the "Cubi" series, his most highly regarded series of sculptures), required a prospective buyer to have a great deal of space available for installation in order to properly exhibit them. Indeed, 185 of the 425 works in Smith's possession at his death were over 7 feet tall and comprised 80 percent of the total retail selling prices estimated by Smith's executors. Finally, Smith's works were priced relatively high, and it was generally acknowledged in the art world that the lowering of an artist's prices signified a lack of confidence in the quality of the work.

Towards the end of Smith's life, Smith began to receive critical recognition of his work and honors commensurate with his status as one of the leading American abstract sculptors. He was appointed to the National Council of Art in 1964, the first such artist to receive this honor; he also participated in the 1962 Festival of Two Worlds in Spoleto, Italy, a guest of the Italian Government and American composer, Gian Carlo Menotti, as well as being awarded a major prize at the 1959 Sao Paulo Biennial of Modern Art. Upon his death, several national magazines which had hitherto ignored Smith noted his contribution to American art, catapulting him into national prominence.

Smith was a prolific sculptor and constantly created a larger number of sculptures than the market could readily absorb. He customarily produced series of between 10 and 30 sculptures which were similar in appearance, technique, and scale. The most prized of Smith's works were those of the "Cubi" series, which consisted of 28 or 29 works of welded, polished steel cubes ranging from 7 feet to 9 feet in height and being offered for sale for between $35,000 and $50,000. Smith's sculptures generally tended to be large and consequently expensive to transport and to warehouse.

At the time of Smith's death and for an undetermined period thereafter, the general public was not aware of how many of Smith's works were in his possession at the time of his death. Had the public been aware of this fact, and had all 425 pieces been made immediately available for sale, the estate and Marlborough could reasonably have expected to get substantially less money for them than if the works were slowly disseminated in the market over a period of years. It was also important to "hold back" certain works for sale at a future date (particularly the more desirable of Smith's works) in order to sustain

interest in his works over the 10-year period of time envisioned by the estate as necessary to liquidate Smith's works.

In valuing the works of art included in the return, the executors first computed the price each piece would bring if sold individually at retail at the time of death, the total hypothetical price being $4,284,000. They then discounted this figure by 75 percent on the theory that these works could only be sold at the time of death to a bulk purchaser for resale, and then reduced this figure by one-third to cover Marlborough's commission. The resulting figure of $714,000 was reported as the date-of-death value of the sculptures.

The terms of decedent's last will anent the administration both of the estate and of the testamentary trust for the benefit of decedent's two minor daughters provide, in part, as follows:

THIRD: My Executors and Trustees shall take possession of my estate and are hereby given power to hold, manage, operate, control, sell, convey, lease, mortgage, encumber, renew encumbrances, and assign the said estate, or any part thereof, to collect all the rents, income and profits therefrom; to pay all taxes, insurance charges, necessary repairs and other proper expenses connected therewith; and with full power to sell and convey, from time to time, and to mortgage and encumber such parts of my property and estate, real or personal, including all of my works of art, as in their best judgment and discretion may be expedient. The proceeds derived from any such sale or sales shall be invested and reinvested from time to time in such securities and property, real or personal, as my Trustees may elect.

In the disposal of my works of art and other property, real and personal, said Trustees shall have as full and unlimited power and discretion as if said trust property were their own absolute estate.

The coexecutors have not yet filed a final accounting of the estate with the New York Surrogate's Court having jurisdiction of the administration of the estate. Their most recent intermediate accounting embraced a period ending on April 30, 1970. In the accountings, an aggregate of $1,187,144.67 representing commissions paid to Marlborough was allowed by the Surrogate's Court.

From May 23, 1965, through April 30, 1970, the estate was required to pay $789,970.38 for various administration expenses, debts of the decedent, and taxes, of which amount $390,481.20 is allowable as a deduction under section 2053. At the time of decedent's death, total cash available to the estate from sources other than the sale of sculptures amounted to $210,647.08. $868,984.95 worth of sculptures were sold through Marlborough to cover the difference between the expenses enumerated above and ready cash, or $579,323.30. Commission expenses of $289,661.65 were incurred in respect of such sales.

In addition to the aforementioned expenses, the executors paid $55,937.75 to the decedent's widow for the support of the two minor children. The executors have also made payments totaling $1,392,491.69

to the trusts created under decedent's will for the benefit of the aforementioned children. While petitioner has claimed a deduction for all commission expenses incurred, respondent has disallowed any deduction for commission expenses in excess of $289,661.65.

## ULTIMATE FINDING OF FACT

The fair market value of the 425 sculptures at the time of Smith's death was $2,700,000.

## OPINION

David Smith, a sculptor, died possessed of 425 pieces of nonrepresentational metal sculptures created by his own efforts. The sculptures were valued at $714,000 in the estate tax return. Respondent, in his deficiency notice, determined that they should be valued at $5,256,918 but now concedes that they should be valued at not more than $4,284,000. It is this issue of valuation, together with a related question involving the deductibility of certain expenses, which the parties have placed before us for decision. We approach the task with considerable circumspection, recognizing that this case involves a highly unusual set of circumstances to which the usual, simplistic valuation approach may not be fully applicable and that, in the final analysis, our ultimate determination of value will necessarily constitute a "Solomon-like pronouncement." See Morris M. Messing, 48 T.C. 502, 512 (1967).

Initially, we are faced with certain broad assertions by petitioner, which attack this proceeding in its entirety. First, it argues that the number and nature of the sculptures, coupled with the limited scope and vagaries of the market in which they might be disposed of, make valuation as of the date of death impossible. Consequently, it argues that we should determine a zero value and that any other determination of value would be a violation of its constitutional rights.[1] We find this argument to be without merit. Valuation has been consistently recognized as an inherently imprecise process. See Morris M. Messing, supra. Difficulties encountered in determining value, e.g., the presence of a limited market or other restrictive elements, have never been considered a bar to accomplishment of that task, much less to have acquired a constitutional significance, although such elements are factors to be taken into account.[2] Publicker v. Commissioner, 206 F. 2d 250 (C.A. 3, 1953); see also George P. Fisher, Executor, 3 B.T.A. 679 (1926).

---

[1] Petitioner claims the benefit of the "equal protection" doctrine, the freedom-of-expression principle embodied in the first amendment, and the due-process clause of the fifth amendment.

[2] In an estate tax case, unlike an income tax case, there is an overriding necessity to determine a value. See Burnet v. Logan, 283 U.S. 404 (1931); Simpson, J., dissenting, in Stephen H. Dorsey, 49 T.C. 606, 634–635 (1968).

Moreover, the record herein shows clearly that the sculptures had value at the date of Smith's death, so petitioner's assertion that they had a zero value is factually baseless.

Petitioner next contends that the process by which respondent arrived at the valuation determined in his deficiency notice was "without foundation, unreasonable and arbitrary." This argument we also reject as without merit. Even if we were to decide that respondent's determination was erroneous, neither that consequence, nor the fact that respondent has reduced his claimed valuation from that set forth in the deficiency notice, constitutes sufficient grounds for disregarding the deficiency notice or relieving petitioner of its burden of proof. *Jacob D. Farber*, 43 T.C. 407, 428–429 (1965). Nothing in this record permits the conclusion that respondent's action was so utterly unjustified as to fall within the ambit of *Helvering* v. *Taylor*, 293 U.S. 507 (1935). Moreover, it is well established that—at least where unconstitutional conduct is not involved—the courts will not inquire into the administrative policies and procedures employed by respondent prior to making his determination. *Arthur Figueiredo*, 54 T.C. 1508 (1970).

Finally, petitioner contends that payment of a prior proposed deficiency was tantamount to a closing agreement and should preclude respondent from asserting any further deficiency. This argument must also be rejected. There is no evidence that the requirements that a closing agreement be in writing and signed by the Secretary of the Treasury or his delegate have been met. Sec. 7121; sec. 301.7121–1, Proced. & Admin. Regs. Mere payment of an asserted deficiency does not satisfy those requirements. *Payson* v. *Commissioner*, 166 F. 2d 1008 (C.A. 2, 1948); cf. *Helen Rich Findlay*, 39 T.C. 580, 588–589 (1962), affirmed in part and reversed in part on other issues 332 F. 2d 620 (C.A. 2, 1964).

We now turn our attention to the critical issue in this case—the determination of the fair market value of the sculptures at the time of Smith's death. In the final analysis, this is essentially a question of fact. *Daniel S. McGuire*, 44 T.C. 801, 812 (1965). As we view the record herein, petitioner does not complain about the mathematical result of respondent's calculation of value, if it is determined that respondent accorded appropriate weight to the various elements involved. Indeed, the value attached by respondent to each piece of sculpture, if it had been sold separately, is identical with the value established by petitioner on the same basis. Where they part company is with respect to the weight to be accorded to the fact that each item would be sold on a market on which 424 other items would simultaneously be available. Respondent claims that such simultaneous avail-

ability would have no adverse impact and that the fair market value of each item should simply be determined by the price at which the item could be separately sold in the retail art market on a "one-at-a-time" basis in accordance with the provisions of section 20.2031–1 (b), Estate Tax Regs.[3] Petitioner asserts that this is totally unrealistic in this case; that the problem must be viewed in the context of what could be obtained if all 425 sculptures were offered for sale at the moment of death; that any purchaser under these circumstances could only be a person or syndicate acquiring the bulk of the sculptures for resale; that such person would be required to make a large cash investment which could be recouped with an acceptable profit only over a long period of time; and that such person would pay only 25 percent of the separate "one-at-a-time" value which, after a further discounting by one-third to take into account the effect of the contract with Marlborough, results in a valuation of $714,000.

We find it unnecessary, in this unusual case, to make any hard-and-fast choice between the two approaches urged by the parties.[4] On the one hand, we think that the initial 75-percent discount, which petitioner has applied to the "one-at-a-time" value in order to determine

---

[3] Sec. 20.2031–1(b). *Valuation of property in general.* The value of every item of property includible in a decedent's gross estate under sections 2031 through 2044 is its fair market value at the time of the decedent's death, except that if the executor elects the alternate valuation method under section 2032, it is the fair market value thereof at the date, and with the adjustments, prescribed in that section. The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts. The fair market value of a particular item of property includible in the decedent's gross estate is not to be determined by a forced sale price. Nor is the fair market value of an item of property to be determined by the sale price of the item in a market other than that in which such item is most commonly sold to the public, taking into account the location of the item wherever appropriate. Thus, in the case of an item of property includible in the decedent's gross estate, which is generally obtained by the public in the retail market, the fair market value of such an item of property is the price at which the item or a comparable item would be sold at retail. * * * The value is generally to be determined by ascertaining as a basis the fair market value as of the applicable valuation date of each unit of property. For example, in the case of shares of stock or bonds, such unit of property is generally a share of stock or a bond. Livestock, farm machinery, harvested and growing crops must generally be itemized and the value of each item separately returned. Property shall not be returned at the value at which it is assessed for local tax purposes unless that value represents the fair market value as of the applicable valuation date. *All relevant facts and elements of value as of the applicable valuation date shall be considered in every case.* The value of items of property which were held by the decedent for sale in the course of a business generally should be reflected in the value of the business. * * * [Emphasis added.]

This regulation was amended to read as above on June 7, 1965, a date subsequent to Smith's death. See T.D. 6826, 1965–2 C.B. 367. Both parties have dealt with this case on the basis of the amended language nevertheless being applicable, and we have no reason to question this approach. See sec. 7805(b). Moreover, our ultimate decision as to the proper valuation would be the same, whichever regulation were applied.

[4] For a discussion of some of the difficulties involved in applying respondent's regulations on a broad-brush basis, see "Federal Estate and Gift Taxation: Amended Regulations Change Valuation for Estate and Gift Taxes," 1966 Duke L. J. 248 *et seq.*; Report of the Committee on Estate and Gift Taxes, 19 Bull. A.B.A. Taxation Section, No. 4, p. 71 (July 1966).

the price which a purchaser would pay for all the sculptures, is too high. On the other hand, we think that respondent should have given considerable weight to the fact that each item of sculpture would not be offered in isolation. We think that, at the very least, each willing buyer in the retail art market would take into account, in determining the price he would be willing to pay for any given item, the fact that 424 other items were being offered for sale at the same time. The impact of such simultaneous availability of an extremely large number of items of the same general category is a significant circumstance which should be taken into account.[5] In this connection, the so-called blockage rule utilized in connection with the sale of a large number of securities furnishes a useful analogy. See *Maytag v. Commissioner*, 187 F. 2d 962, 965 (C.A. 10, 1951), affirming a Memorandum Opinion of this Court; *Helvering v. Maytag*, 125 F. 2d 55, 63 (C.A. 8, 1942), affirming a Memorandum Opinion of this Court; *Helvering v. Safe Deposit & Trust Co. of Baltimore*, 95 F. 2d 806, 811–812 (C.A. 4, 1938), affirming 35 B.T.A. 259 (1937); *Estate of Robert Hosken Damon*, 49 T.C. 108, 117 (1967). We think that a museum or individual collector of art objects would not completely ignore the resale value of a given item, although it obviously has far less significance than in the case of a dealer. Moreover, the "retail market" claimed by respondent may well encompass the use of an auction method of disposal (to be distinguished from the usual forced-sale concept) for at least a part of the art objects;[6] in such a situation the presence of a large number of pieces on the market at one time would be a most material factor. Under the foregoing circumstances, we think that, in this case, the amount which an *en bloc* purchaser for resale would pay and the aggregate of the separate "one-at-a-time" values to be obtained by a variety of dispositions in the "retail market" would be the same.

We have taken into account certain other elements involved in the valuation process as they existed at the moment of death. These include[7] the fact that Smith's reputation as a sculptor had not fully blossomed; the relatively low level of acceptability of nonrepresentational sculpture in the market place; the distribution of the 425 items according to size, period in Smith's life during which they were created, and their expression, in relative terms, of the quality of

---

[5] See sec. 20.2031–1(b), Estate Tax Regs., fn. 3 *supra*: "All relevant facts and elements of value as of the applicable valuation date shall be considered *in every case*." (Emphasis added.) Compare *Bankers Trust Co. v. United States*, 284 F. 2d 537 (C.A. 2, 1960); *Old Kent Bank & Trust Co. v. United States*, 292 F. Supp. 48 (W.D. Mich. 1968).

[6] We note that art objects are frequently disposed of by way of auction (to be distinguished from a forced-sale auction) and that estimates of prices to be obtained by a sale of such objects in this fashion are of some significance. See *Eugene P. Mathias*, 50 T.C. 994, 999 (1968).

[7] In listing such elements, we do not mean to imply that we have set forth every consideration which has influenced our decision herein.

Smith's work; Smith's tendency to work in series and whether or not a given item was part of a complete series owned by Smith at his death; the number of sales by Smith (or his agents) in the 25 years before his death and the prices at which sales were made during the period immediately preceding and following death;[8] the fact that the bulk of the items was located at Bolton Landing, N.Y., which was relatively inaccessible, and that a large number of the items could not have been readily transported to a location more accessible to potential buyers.[9]

One element of value which petitioner urges be taken into account relates to its obligation to Marlborough by virtue of the exclusive agency contract which Smith made and which survived his death. Petitioner insists that any value based upon the gross sales price must be reduced by one-third to take into account the commissions to which Marlborough was entitled. We think any reduction in value with respect to this element is precluded by the decided cases. In *Publicker* v. *Commissioner, supra,* the court refused to permit the price which could be realized on the sale of a piece of jewelry to be reduced by the Federal excise tax which would have been payable. Cf. also *Estate of Frank Miller Gould,* 14 T.C. 414 (1950).[10] The measure of value laid down by these cases is what could be *received* on, not what is *retained* from, a hypothetical sale. Even if one may question the equating of "price" with the gross price including tax, in situations involving the excise tax, it cannot be gainsaid that the "price" herein is what a purchaser would pay for a piece of sculpture. Cases such as *Estate of Albert L. Salt,* 17 T.C. 92 (1951), relied upon by petitioner, are not in point. Concededly, they limit the value of property subject to a restrictive agreement, but they, too, look to what the estate of the decedent can obtain, not to the net it will retain when the property is sold. Nor does an examination of the contractual relationship between Smith and Marborough reveal sufficient elements to construct a joint venture which might have given Marlborough an interest in the sculptures themselves with a consequent effect on the value at death (cf. Raum, *J.,* concurring, in *Harry C. Porter, Transferee,* 49 T.C. 207, 227 (1967))—an effect which we might add could have favorable as well as unfavorable aspects to a taxpayer in the valuation process.

---

[8] Provided they are not too far removed from the critical date, sales before and after such date may be used to corroborate the ultimate determination of value. In this case, we have given little weight to sales taking place more than 2 years after Smith's death. See *Fitts' Estate* v. *Commissioner,* 237 F. 2d 729, 731 (C.A. 8, 1956), affirming a Memorandum Opinion of this Court; *James Couzens,* 11 B.T.A. 1040, 1165 (1928); cf. sec. 20.2031–2(b), Estate Tax Regs.

[9] Compare sec. 20.2031–1(b), Estate Tax Regs., fn. 3 *supra,* which recognized the propriety of "taking into account the location of the item."

[10] While both *Publicker* and *Gould* are gift tax cases, the provisions relating to value in the gift and estate tax areas have been held to be *in pari materia. Merrill* v. *Fahs,* 324 U.S. 308, 311–313 (1945).

Having carefully considered the entire record herein, we conclude that the fair market value of the 425 sculptures at the moment of Smith's death was $2,700,000.

We now address ourselves to the remaining issue in the case, namely, the extent to which the commissions to which Marlborough was entitled are deductible as administration expenses under section 2053(a).[11]

The argument of the parties essentially focuses on section 20.2053-3(d), Estate Tax Regs., which provides in pertinent part as follows:

(d) *Miscellaneous administration expenses.*

\*  \*  \*  \*  \*  \*  \*

(2) Expenses for selling property of the estate are deductible if the sale is necessary in order to pay the decedent's debts, expenses of administration, or taxes, to preserve the estate, or to effect distribution. The phrase "expenses for selling property" includes brokerage fees and other expenses attending the sale, \* \* \*

This regulation has been in effect in substantially the above form since 1919 and its restrictive language was sustained in *Estate of Christine Swayne*, 43 T.C. 190, 201–202 (1964). Compare *Ballance v. United States*, 347 F. 2d 419, 423 (C.A. 7, 1965).

The respondent concedes that, to the extent that the sculptures had to be sold to pay taxes, debts, etc., commissions attributable to such sales are deductible. Petitioner argues that additional Marlborough commissions[12] are deductible on the ground that they were incurred to preserve the estate and/or they were incurred in order to effect distribution of the estate. We think petitioner's claim must be rejected. *Estate of Christine Swayne, supra.*

The mere fact that the commissions claimed by petitioner herein to be deductible were allowed by the New York Surrogate's Court

---

[11] SEC. 2053. EXPENSES, INDEBTEDNESS, AND TAXES.

(a) GENERAL RULE.—For purposes of the tax imposed by section 2001, the value of the taxable estate shall be determined by deducting from the value of the gross estate such amounts—

(1) for funeral expenses,

(2) for administration expenses,

(3) for claims against the estate, and

(4) for unpaid mortgages on, or any indebtedness in respect of, property where the value of the decedent's interest therein, undiminished by such mortgage or indebtedness, is included in the value of the gross estate,

as are allowable by the laws of the jurisdiction, whether within or without the United States, under which the estate is being administered.

[12] It is not clear to us the precise extent to which petitioner claims deductibility—i.e., whether it would limit its claim to those commissions actually revealed by this record as having been paid or whether it would anticipate that a favorable decision on our part would entitle it to keep the question of tax liability open until the estate had made its last sale and paid the applicable commission to Marlborough, an event which has apparently not yet taken place. In view of our disposition of the issue at hand, we find it unnecessary to seek clarity on this point.

is not sufficient. The clause "as are allowable by the laws of the jurisdiction * * * under which the estate is being administered," contained in section 2053(a), establishes a threshold and not an exclusive condition; the requirements of respondent's regulations must also be satisfied. *Pitner* v. *United States*, 388 F. 2d 651, 659–660 (C.A. 5, 1967) ; *Estate of Christine Swayne, supra.* Compare *Estate of James S. Todd, Jr.*, 57 T.C. 288 (1971), where we held that the claimed expense had both been allowed by the Probate Court and was necessarily incurred to preserve the estate. Compare also *Dauphin Deposit Trust Co.* v. *McGinnes*, 208 F. Supp. 228, 237–238 (M.D. Pa. 1962), affirmed on another issue 324 F. 2d 458 (C.A. 3, 1963), and *In Re Bartlett's Estate*, 153 F. Supp. 674, 678 (E.D. Pa. 1957), both of which rested on a presumption of "necessity" under Pennsylvania law.

Clearly, there was no necessity under the will to sell the sculptures beyond the point necessary to discharge funeral and administration expenses and claims. Indeed, the will itself contemplated a distribution of the sculptures in kind to the trusts for the benefit of Smith's daughters. Smith was under no obligation to support his daughters after his death nor were his executors under any such obligation. *In Re Garcy's Trust*, 19 App. Div. 2d 811, 243 N.Y.S. 2d 464 (1st Dept. 1963). The trust was the vehicle for support and, if cash were necessary for that purpose, the trustees, not the executors, were the ones required to make the decision to sell and it is they who would have incurred the concomitant obligation to pay Marlborough its commission. To the extent that the executors made decisions to sell in order to provide support money, they were acting on behalf of the trust and not on behalf of the estate. Cf. *Sharpe's Estate* v. *Commissioner*, 148 F. 2d 179, 181 (C.A. 3, 1945).

We are not impressed with petitioner's argument that, because of the volatile nature of the art market, it was necessary in order to "preserve the estate" to accept any reasonable offer which may have been made. Such a general thesis applies in almost every estate situation and the area of discretion vested in the executors is very broad indeed. In fact, the schedule of actual sales and the increasing prices the executors were able to obtain indicate that haste might well have made waste. Certainly, there is nothing in the record to justify analogizing the sculptures to perishable goods, which by their very nature have to be sold promptly, or with an unexpectedly serious development which sometimes may make sales the sine qua non of preserving the estate.

The regulations appear to be directed toward safeguarding the integrity of the estate tax by making certain that administration expenses which are properly deductible will normally be limited to those

which could be anticipated as being necessarily incurred and paid during the period of administration. To allow the commissions to the extent claimed by petitioner herein would seriously undermine the achievement of that sound objective.[13] Moreover, there can be no assurance that all or any specific number of art objects would in fact be sold with the result that the amount of commissions payable would, in any event, be highly speculative. Cf. *Estate of John B. Sharpe*, 3 T.C. 612, 626 (1944), affirmed sub nom. *Sharpe's Estate* v. *Commissioner*, 148 F. 2d 179 (C.A. 3, 1945).[14]

We hold that petitioner's deduction under section 2053 is limited to amounts paid for administration expenses, debts, and taxes in the sum of $390,481.20 plus $289,661.65 representing commissions paid to Marlborough, without prejudice to petitioner's rights under Rule 51.[15]

Reviewed by the Court.

*Decision will be entered under Rule 50.*

---

TIETJENS, *J.*, dissenting and concurring: This case was tried before Judge John W. Kern. Judge Kern died before he decided the case which then was assigned to me without objection.

I do not disagree on the valuation issue so far as the discussion of the legal principles to be applied is concerned. I would, however, give more weight to the actual sales prices of various pieces of statuary sold both before and after the sculptor's death as well as uncontested evidence of values placed on the separate pieces by both the respondent and petitioner if they had been sold separately. Accordingly I would find the fair market value of the 425 sculptures to be $4,284,000.

On the remaining issue I concur.

---

GOFFE, *J.*, concurring in part, dissenting in part: I concur with the majority of the Court as to the fair market value of the sculptures

---

[13] A similar result would obtain if deduction of commissions were allowed on the basis that they were claims against the estate, contingent and speculative at death but becoming a reality during the period of administration. Moreover, any such rationale might require an evaluation of the contract as an asset insofar as it enabled the estate to obtain Marlborough's services. Cf. *Commissioner* v. *Wragg*, 141 F. 2d 638 (C.A. 1, 1944) ; *Parrott* v. *Commissioner*, 30 F. 2d 792 (C.A. 9, 1929) ; compare *Estate of George Herbert Atkins*, 2 T.C. 332, 346–347 (1943).

[14] We also note that the obligation to use Marlborough as a selling agent had only approximately 3 years to run at the time of Smith's death.

[15] Since the amount of $289,661.65 does not include an allowance for commissions on sales necessary to raise the funds with which to pay any estate taxes beyond those already paid, i.e., the additional estate tax resulting from our decision herein, a further deduction for such commissions and any other items encompassed within Rule 51 should be taken care of in the Rule 50 computation.

at the date of decedent's death but I must respectfully dissent on the issue of the extent of deductibility of selling commissions as administration expenses.

Petitioner did not raise as an issue the possible invalidity of section 20.2053–3(d)(2), Estate Tax Regs. The opinion of the majority, however, determines that such section of the regulations is valid because of its age, its approval in *Estate of Christine Swayne, supra,* and because it is necessary in order to safeguard "the integrity of the estate tax by making certain that administration expenses which are properly deductible will normally be limited to those which could be anticipated as being necessarily incurred and paid during the period of administration."

I am constrained to dissent because I think it obvious that the section of the regulations is clearly outside the scope of the Code and contrary to the intent of Congress; the age of the section gives it no validity because it is contrary to the committee reports covering reenactment of the Code section; and because this Court did not pass upon the validity of the section in *Swayne,* but has, instead, ignored the application of the section in other cases, as have other courts.

Section 2053(a)(2) of the Internal Revenue Code of 1954 provides as follows:

SEC. 2053. EXPENSES, INDEBTEDNESS, AND TAXES.

(a) GENERAL RULE.—For purposes of the tax imposed by section 2001, the value of the taxable estate shall be determined by deducting from the value of the gross estate such amounts—

    (1) for funeral expenses,

    (2) for administration expenses,

    (3) for claims against the estate, and

    (4) For unpaid mortgages on, or any indebtedness in respect of, property where the value of the decedent's interest therein, undiminished by such mortgage or indebtedness, is included in the value of the gross estate,

as are allowable by the laws of the jurisdiction, whether within or without the United States, under which the estate is being administered.

Section 20.2053–3(d)(2), Estate Tax Regs., provides as follows:

(d) *Miscellaneous administrative expenses.*

   *        \*        \*        \*        \*        \**

(2) Expenses for selling property of the estate are deductible if the sale is necessary in order to pay the decedent's debts, expenses of administration, or taxes, to preserve the estate, or to effect distribution. The phrase "expenses for selling property" includes brokerage fees and other expenses attending the sale,

\* \* \*

It is apparent that the regulations impose a limitation upon the deductibility of selling expenses not prescribed by the Code, to wit, the sale giving rise to the expense must be necessary in order to pay the decedent's debts, expenses of administration, or taxes, to preserve

the estate or to effect distribution. It is this limitation which the majority of the Court applies against the petitioner to reduce its deduction for selling expenses.

I am not unmindful of the principle of statutory reenactment upon which the majority apparently relies for its observation that the section 20.2053–3(d)(2) of the regulations has been in effect since 1919. The principle of statutory reenactment is a rule of statutory construction and must be indulged in to find that Congress, by enacting section 2053(a)(2) of the Internal Revenue Code of 1954, intended to incorporate therein section 81.35 of Regs. 105 (not materially different from section 20.2053–3(d)(2), Estate Tax Regs.). The committee reports for the Internal Revenue Code of 1954 reflect no consideration of section 81.35 of Regs. 105. House Report No. 1337 is as follows:

G. *Expenses, indebtedness, and taxes* (sec. 2053)

Funeral expenses, administration expenses, claims against the estate and unpaid mortgages are deductible in computing the taxable estate under present law. However, this deduction is limited to those expenses allowable by the laws of the jurisdiction under which the estate is being administered and cannot exceed the value of the property included in the gross estate subject to claims, that is, the probate estate. Thus, if the decedent has placed most of his assets in a trust (not includible in his probate estate) funeral and other expenses actually paid * * * out of the trust assets are not allowed as a deduction to the extent they exceed the value of the property in the probate estate.

These arbitrary distinctions have been removed under your committee's bill. Expenses incurred in connection with property subjected to the estate tax, although not in the probate estate, are to be allowed as deductions, if the expenses are of the type which would be allowed as deductions if the property were in the probate estate and they are actually paid within 1 year of the decedent's death.

In addition, expenses in connection with property subject to claims are to be allowed without regard to the total value of the probate estate if they are paid within the period provided for the assessment of the estate tax. [H. Rept. No. 1337, to accompany H.R. 8300 (Pub. L. No. 591), 83d Cong., 2d Sess., p. 91 (1954). S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. No. 591), 83d Cong., 2d Sess., pp. 124–125 (1954).]

The lack of indication that Congress considered the regulations brings the matter into precisely the holding of the Supreme Court in *Commissioner* v. *Glenshaw Glass Co.*, 348 U.S. 426 (1955), where the Court stated at page 431 of its opinion:

Re-enactment—particularly without the slightest affirmative indication that Congress ever had the *Highland Farms* decision before it—is an unreliable indicium at best.

I submit that Congress considered only the limitation of State law in enacting section 2053(a)(2) of the Internal Revenue Code of 1954 as the report quoted above obviously demonstrates.

The majority feels that the limitation imposed only by the regulations is necessary to safeguard the integrity of the estate tax. Congress apparently did not feel such a safeguard was necessary. Congress provided that deductions for selling expenses were allowable if permitted under State law. That is the sole limitation provided by Congress in the statute and reflected in the committee reports. If additional safeguards are needed they should come from Congress, not from the Secretary or his delegate in the form of unauthorized regulations. In my opinion the integrity of the estate tax must be safeguarded from unauthorized and unwarranted limitations imposed by regulations as well as abuses which may occur elsewhere.

The majority indicates that section 20.2053-3(d)(2), Estate Tax Regs., has been sustained by this Court in *Estate of Christine Swayne*, *supra*. Nothing in that opinion indicates that the validity of the regulations was challenged. The Court did not state that the regulations were valid. In the instant case the validity of the regulations was not challenged but the majority of the Court undertakes to decide they are valid. The opinion in *Swayne* distinguishes *Estate of Louis Sternberger*, 18 T.C. 836, (1952), affd. 207 F. 2d 600 (C.A. 2, 1953), reversed on other grounds 348 U.S. 187 (1955).[1] It is distinguished on the ground that the Sternberger estate was being administered under the laws of New York rather than under the laws of Connecticut where the Swayne estate was being administered. The Court specifically found in Sternberger that the proceeds from the property sold which gave rise to the expenses deducted were not needed to pay debts or expenses but were allowable under New York law. I believe the *Sternberger* case is squarely in point and the majority opinion herein is incorrect where it says at pages 660–661 that:

The mere fact that the commissions claimed by petitioner herein to be deductible were allowed by the New York Surrogate's Court is not sufficient. The clause "as are allowable by the laws of the jurisdiction * * * under which the estate is being administered," contained in section 2053(a), establishes a threshold and not an exclusive condition; the requirements of respondent's regulations must also be satisfied. * * *

My position is supported by the opinion of the U.S. Court of Appeals for the Seventh Circuit in *Ballance* v. *United States*, 347 F. 2d 419 (C.A. 7, 1965). It may well be that in fulfilling the test of allowability under State law the taxpayer is also fulfilling a requirement of that section of the regulations which I find invalid. Be that as it may, the test is still State law. See *Dauphin Deposit Trust Co.* v. *McGinnes*, 208 F. Supp. 228 (M.D. Pa. 1962), affirmed on another

---

[1] The issue of deductibility of selling expenses in *Sternberger* was not raised on appeal.

issue 324 F. 2d 458 (C.A. 3, 1963), and *In Re Bartlett's Estate*, 153 F. Supp. 674 (E.D. Pa. 1957).

I believe this situation existed in our opinion in *Estate of James S. Todd, Jr., supra*, cited by the majority; i.e., allowability under State law fulfilled the test set forth in the regulations. I see nothing in the *Todd* opinion, however, indicating that the validity of the regulations was in issue or necessarily determined to be valid.

For the foregoing reasons, I believe petitioner should be allowed to deduct all the selling expenses paid.

FORRESTER, DAWSON, and HOYT, *JJ.*, agree with this concurring and dissenting opinion.

WITHEY, *J.*, agrees only with respect to the dissent.