William J. Van Allen and Matilda A. Van Allen v. Commissioner.
Van Allen v. Commissioner
Docket Nos. 3169-71, 5122-71.
United States Tax Court
T.C. Memo 1972-220; 1972 Tax Ct. Memo LEXIS 33; 31 T.C.M. (CCH) 1095; T.C.M. (RIA) 72220; October 26, 1972
John M. Hanley, 110 E. Wisconsin Ave., Milwaukee, Wis., for the petitioners. Michael W. Ford and James L. Norris, for the respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: In these consolidated cases respondent determined the following Federal income tax deficiencies and additions to tax against the petitioners: Addition to Tax
Taxable
Sec. 6653(a),
Year
Deficiency
I.R.C. 1954
1967
$ 2,526.18
$126.31
1968
12,379.21
1969
2,120.18
106.01
Concessions as to most of the issues have been made by the parties and can be given effect in the Rule 50 computations. Still at issue is the fair market value on April 3, 1967, of 845 portable exchange service units purchased by petitioner *34 William J. Van Allen from Culligan Soft Water Service, Inc., of Sheboygan. It is necessary to determine such value so that the correct amount of allowable depreciation of these assets can be computed. 1096 Findings of Fact Some of the facts have been stipulated by the parties and are so found. The petitioners are husband and wife whose legal residence was Plymouth, Wisconsin, when they filed their petitions in these proceedings. They filed their joint Federal income tax returns for the years 1967, 1968 and 1969 with the district director of internal revenue at Milwaukee, Wisconsin. In 1948, William J. Van Allen (herein called petitioner) began operating Culligan Soft Water as a sole proprietorship. The scope of his operations encompassed the western half of Sheboygan County, Wisconsin. Operating under a franchise from Culligan, Inc., of Northbrook, Illinois, his services involved the installation and servicing of apparatus designed to remove harsh chemicals from the local water supply. The apparatus consisted of a water filtration vessel connected with a series of valves and piping to a water line. These portable exchange-type service units, which connected to the water *35 supply via a slip connector, were replaced at regular intervals determined by the capacity of the service unit as well as individual water consumption. The service unit would be removed and taken to a central plant where the chemical filtration element would be recharged. The service unit would then be available for use at another installation. With a replacement cycle averaging 28 days, petitioner was required to maintain an inventory of service units. This was necessary so that he could guarantee continuity of service to his customers. On March 1, 1967, the petitioner offered to purchase Culligan Soft Water Service, Inc., a Culligan franchise operating in the eastern half of Sheboygan County, Wisconsin. On March 2, 1967, this offer was accepted. The sale price was to be computed by multiplying the number of revenue producing service units by $75 with appropriate adjustments to be made at the time of closing. At closing it was determined that there were 717 revenue producing service units supported by a float of 128 service units. The bill of sale dated April 3, 1967, listed a sales price of $51,755. All required franchise assignments were procured by the April 3, 1967, closing *36 date. Attached to the bill of sale was a breakdown of the sales price. This showed inter alia: 845 Culligan Portable Service Units… $28,025.00 717 Service Connections…14,698.50 Petitioner, without objection from the seller, allocated $28,025 as the cost of the 845 service units. This was further allocated among the different types of service units as follows: Units
Description
Allocation
777 9inch
Cullite Units at $32.73
$25,431.21
23 9inch
Resin Units at 43.00
989.00
36 7inch
Resin Units at 34.71
1,249.56
9 9inch
Iron Filters at 39.47 355.23
Total
$28,025.00
An age analysis shows that these service units had been acquired by the seller as follows: Number
Year
Acquired
1967
none
1966
37
1965
33
1964
75
1963
100
1962
30
1961 and prior
560
Petitioners' 1967 Federal income tax return shows an account for depreciation purposes entitled "service units." These were the units acquired in the 1967 purchase. The cost shown is $33,311.15. [1]
*37 During the years in question the petitioner claimed the following depreciation deductions based on an asset value of $33,311.15: Year
Amount
1967
$6,662.23
1968
3,331.11
1969
6,662.25
On June 26, 1968, petitioner, as the sole shareholder, incorporated Culligan Sheboygan County, Inc., under the laws of the State of Wisconsin. On June 30, 1968, petitioner transferred certain assets from his sole proprietorship to the newly formed corporation. This corporation elected and has maintained its status as a small business corporation. In the Small Business Corporation Income Tax Return (Form 1120-S) for 1968 the corporation showed an asset account value of $33,311.15 for the portable service units acquired during 1967. 1097 Respondent determined that each portable service unit had an average value when new of $33. Applying a five-year useful life to the 845 service units, respondent valued them at $5,126 as of the date of purchase. This was arrived at by depreciating each service unit by a uniform amount of $6.60 per year for five years. This figure represents only the book value of the service units to the seller. It does not purport to reflect to the *38 purchaser the fair market value of the units as of the date of sale. Ultimate Findings The sum of $19,478.69 was the fair market value of the 845 portable exchange service units on April 3, 1967. This amount is allocated as follows: Fair Mar-
No. of
ket Value
Units Description
Per Unit
Total
777 9inch Cullite Units
$22.44
$17,435.88
23 9inch Resin Units
33.73
775.79
36 7inch Resin Units
28.14
1,013.04
9 9inch Iron Filters
28.22
253.98
Opinion Asset valuation is not an exact science. A degree of imprecision is inevitable. That the task is difficult is no warrant for abjuration. See Morris M. Messing, 48 T.C. 502, 512 (1967); Estate of David Smith, 57 T.C. 650 (1972). Here the situation is made easier by the presence of agreed values for other items. The service connections, including the names and addresses of all customers, are valued at an agreed figure. The chemicals in the service units delivered to the customers are also valued. It is only the value of the service units which is in dispute. Petitioner, in the bill of sale, valued each service unit at a figure much greater than respondent. The testimony *39 adduced at trial established even higher values for these service units if they had been bought new at the time of the sale of Culligan Soft Water Service, Inc., to petitioner. Certain postulates in this area of the law are familiar. Respondent's valuation is presumptively correct and the petitioner bears the burden of proving such value erroneous. The value given to a certain asset by a purchaser is not automatically acceptable for Federal tax purposes. The economic realities of the purchase situation must be considered. Commissioner v. Court Holding Co., 324 U.S. 331 (1945); Estate of Robert R. Gannon, 21 T.C. 1073, 1083 (1954). The transaction before us is one between a willing buyer and a willing seller each acting with comparable knowledge. Both participants to the transaction had years of experience in the business of selling and maintaining soft water treatment units. Missing from this transaction is the often encountered mutually antagonistic interests in the tax attributes and characteristics of the sale. The existence of such antagonistic positions is frequently an aid in valuation. The bargaining here did not encompass the tax attributes of *40 the sale. The seller was interested in securing what he considered a fair price for his business. The buyer's tax treatment was of no moment to the seller. This was not a transaction entered into solely for its tax consequences. Petitioner testified that he received no advice as to the tax consequences of the purchase prior to the closing. The basis for depreciation purposes of an asset may generally be said to be its cost to the taxpayer. The useful life of the asset is to be calculated bearing in mind the estimated economic usefulness to the taxpayer. See Massey Motors v. United States, 364 U.S. 92 (1960). Section 1.167(a)-1(b), Income Tax Regs., provides For the purpose of section 167 the estimated useful life of an asset is not necessarily the useful life inherent in the asset but is the period over which the asset may reasonably be expected to be useful to the taxpayer in his trade or business or in the production of his income. Knowing the number and approximate ages of the service units, their expected useful life, their revenue producing capabilities, and their warranted capacity, the petitioner attempted to allocate to these units that portion of the purchase *41 price indicative of their value. The prices in 1967 for new service units exceeded the allocation cost in every case. However, nearly 66 percent of these service units were over five years old when purchased, even though they were warranted by the seller to be "in good useable condition, free from leakage and substantial corrosion, and [to] comply with Culligan's rated capacity for such units." Nothing in the record shows that any of the service units would fail to meet the warranty given. The testimony indicates that service units sold following the extension of "pure" water lines into certain areas would sell at a very low price. Other 1098 testimony indicates that service units that had corroded and were seriously deficient in purification capabilities would likewise sell at a depressed price. No such defects were present with respect to the instant sale. To the contrary the petitioner was satisfied in every detail of the sale. All service units measured up to their warranty. While it would be unreasonable to value these units at the same value as new ones, it is equally unreasonable to value them as scrap. Respondent has in effect valued 66 percent of the units at their *42 fully depreciated or book value. This implies a zero value. We think this is incorrect and fails to take into account the value of the economic usefulness inherent in the units when purchased. See Estate of Peter Finder, 37 T.C. 411, 424 (1961). All the units purchased were fully warranted, installed and operative. This fact lends some support to petitioner's argument that the price paid for the units included a tacit recognition of this value. Here value is made up of more than the cost of the metal tank and its chemicals. The petitioner has conceded that the value of the customer list is a nondepreciable asset with a value of $14,699.50. The bill of sale drawn by petitioner is extensive and meticulous. Every item is priced individually. We are impressed with the careful nature of the listing and the fact that no other item is challenged by respondent. Certainly a detailed list unchallenged by the respondent is not to be deemed in any respect the final arbiter of cost and basis in this case. Nevertheless we have found it useful. Petitioner has spent virtually all his career in this business and was aware of the cost of the items he was buying both individually and in *43 the aggregate. Testimony from a lifetime employee of Culligan, Inc., indicated that a scrapped service unit might have a value of only $5 while an installed revenue producing unit would be worth $25 to $30. The value would reflect its rated capacity, its structural soundness and the quality of the chemicals used. Using our best judgment under these circumstances, we have found as an ultimate fact that the fair market value of the 845 portable exchange service units on April 3, 1967, was $19,478.69. To reflect this conclusion and the agreement of the parties on other issues, Decisions will be entered under Rule 50. Footnotes
1. This is composed of $5,286.15 as the value of the filtration chemicals and $28,025 as the value of the service units. The parties agree as to the value for depreciation of the chemicals and a five-year useful life for the service units.↩