ESTATE OF SAMUEL A. AGNEW, Deceased, SEATTLE-FIRST NATIONAL BANK and SAMUEL J. AGNEW, Co-Executors, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Agnew v. Commissioner
Docket No. 6198-69.
United States Tax Court
T.C. Memo 1975-173; 1975 Tax Ct. Memo LEXIS 198; 34 T.C.M. (CCH) 758; T.C.M. (RIA) 750173; June 2, 1975, Filed Charles F. Osborn and J. M. Cunningham, for the petitioners. Richard Shipley, for the respondent. HALL MEMORANDUM FINDINGS OF FACT AND OPINION HALL, Judge: Respondent determined a deficiency of $7,396,001.95 in the Federal estate tax of the estate of Samuel A. Agnew. All issues have been settled by the parties except one. The sole issue for decision is how much, if any, of the executor's fee paid to Samuel Jay Agnew *199 is deductible as an administration expense for estate tax purposes. FINDINGS OF FACT Some of the facts have been stipulated and are accordingly found. At the time of his death in Centralia, Washington on June 26, 1965, Samuel A. Agnew was a resident of Lewis County, Washington. Decedent was 86 years old and left a will dated March 25, 1964 and accompanying codicil dated April 9, 1964. The will appointed the decedent's son, Samuel Jay Agnew ("Jay Agnew") and the Seattle-First National Bank ("Bank") co-executors. On July 1, 1965, the decedent's will was admitted to probate in the Superior Court of the State of Washington for Lewis County, and the court appointed Jay Agnew and the Bank co-executors. Jay Agnew is a college graduate with a degree in business administration. For two years he studied forestry in college. Prior to 1963 he was primarily engaged in managing his father's ranch and farm operations in Washington, and did not participate in the family timber operations which were confined primarily to the State of Oregon. Beginning in 1963, due to his father's failing health, he became active in the Oregon timber operations. At the time of trial Jay Agnew was 56 years *200 old. The will and codicil, after providing certain specific bequests, provided that the residue of the estate be placed in trust for the benefit of decedent's widow, Kathryn Agnew, for her life. Upon her death [1] the property was to be distributed, after certain additional bequests, as follows: 55 percent to Jay Agnew; 25 percent in trust for the benefit of Jay Agnew and his wife during their lifetimes, and upon the death of the survivor of them to their children, Danny and Zan Agnew; and 20 percent in trust for the benefit of Danny and Zan Agnew. Jay Agnew and the Bank were designated by the will and approved by the court as co-trustees of the trusts. Since the estate was clearly solvent, it was able to qualify under Washington law as a "non-intervention" estate, a status which allows probate with a minimum of court supervision. [2]
The will provided that in the management of the estate and trusts the Bank would abide by the decisions of Jay Agnew. Except for certain specific bequests and a token amount used to fund the residuary trusts, the estate has not been distributed. *201 On January 1, 1965, decedent and his wife made gifts to Jay Agnew of certain community property located in Oregon[3] and California. [4] Decedent's one-half interest in these properties was included, as a gift in contemplation of death, in his gross estate for Federal estate tax purposes. The gift property located in Oregon included certain timber lands. At the time of his death, decedent and his wife owned certain community property located in the State of Washington. All of this property was subject to probate in Washington. In addition, decedent and his wife owned timber property and other *202 assets located in the State of Oregon. All of these Oregon assets, having an approximate value of $16,000,000, were the subject of an ancillary probate administration in Curry County, Oregon. None of the Oregon property was appraised or inventoried in the Washington probate proceeding. The decedent's will directed that Jay Agnew should either serve as executor of the Oregon estate or choose the administrator if he and/or the Bank were not able to serve. Because Oregon law did not at that time allow non-residents to serve in that capacity, Jay Agnew arranged for Maurice Saunders, an Oregon resident, to become the Oregon administrator of decedent's estate. Saunders was an employee and friend of Jay Agnew and served without compensation. Subsequently, Oregon law was changed to allow a non-resident individual to act as executor. Thereafter, Saunders resigned in favor of Jay Agnew, who was appointed as executor by the Oregon probate court on March 15, 1973. An attorney, William E. Taylor, was engaged to assist in the Oregon administration. He was paid a fee of $25,000. The services rendered by the Bank as executor were extensive and varied. Much time and effort was expended in inventorying *203 and inspecting the assets, formulating overall policy, preparing and reviewing tax returns, participating in certain litigation, evaluating claims against the estate, reviewing and planning investments and consulting with Jay Agnew and legal counsel to attempt to settle Federal and state estate, inheritance, and income tax deficiencies. While the Bank has previously been the executor for many estates, this ranks among the largest, most diverse, and complicated estates the Bank has ever administered, either jointly or alone. Several Bank employees from various departments were involved, including members of the trust, tax, accounting and investment departments. A number of officers in these departments were employed almost full time for several years on the estate. At the time of trial the estate was still attempting to resolve Federal and state tax conflicts. Jay Agnew performed services of the same general nature as did the Bank. There was, however, no duplication of services to the estate. Shortly after the decedent's death in June 1965, Jay Agnew, together with the Bank, developed a long-term plan for management of the decedent's timber land, including harvesting the timber, reseeding *204 the cutover land, and bringing it to a sustaining cycle. It takes 30 to 50 years after reseeding before timber is marketable. A long-term approach was taken by Jay Agnew in other areas as well. He negotiated a 25-year lease of coal land the estate held in Washington to several utilities companies on a royalty basis. In making investments as co-executor, Jay Agnew purchased securities with a long-term capital gains position in mind. Jay Agnew was responsible for the daily management of the total estate, including the Oregon administration, and was the final arbiter of disagreements between himself and his co-executor. To aid him in this task, Jay Agnew had certain employees of one of his companies, the Agnew Lumber Company in Centralia, Washington, perform bookkeeping, investment analysis, banking, secretarial, tax planning and other services for the estate. The cost of office assistance provided by the Agnew Lumber Company between 1966 and 1972, inclusive, attributable to the management of the estate and for travel expenses was approximately $137,226. This sum was deducted for Federal income tax purposes as business expenses by either the Agnew Lumber Company or S.J. Agnew Company, *205 an individual proprietorship owned by Jay Agnew. The figure does not include any salary for Jay Agnew. No part of these expenses was reimbursed by the estate. Jay Agnew did not maintain a detailed time record of his activities as executor. Because the estate's affairs were inextricably interwoven with all of his business affairs, he considered every decision made to be at least in part an estate administration decision. Under Jay Agnew's management neither the main estate nor the ancillary estate purchased any additional timber or timberlands except to "square up" or "block-up" lines. [5] This occurred on approximately four occasions. As executor, Jay Agnew employed certain individuals to guard the timber against fire and insect infestation. The estate's Oregon land and the Oregon land which Jay Agnew had received from his parents as a gift in 1965 were managed as a unit, with no allocation made between the two parcels regarding maintenance and other costs. The land belonging to Jay Agnew personally was not logged from the time of the gift to the time of trial. Prior to his death, the decedent had entered *206 into a contract with Jay Agnew under the terms of which Jay Agnew cut and removed certain Oregon timber owned by decedent. The contract remained in effect after decedent's death, during which time the contract was revised several times. The contract and the laws of Washington and Oregon required reforestation when timber was cut. The estate liquidated some of its assets, and the proceeds have been used or reserved for the payment of estate, inheritance and income taxes, and administrative expenses. The executors expect those items to total in excess of $10,000,000. The total estate income from the date of death through 1972 was $4,941,246, before Oregon and Federal income taxes. On May 29, 1973 the co-executors filed a joint "Petition for Approval of Executor's [sic] Fees" in the Lewis County Superior Court. A detailed explanation of the services rendered to the estate by each co-executor was attached, along with four exhibits. The executor fee schedule normally used by the Bank would have resulted in a fee of approximately $635,000. However, in recognition of the fact that the everyday operations of the estate were managed by Jay Agnew, the Bank claimed only $440,193.12. Jay *207 Agnew claimed total executor's fees of $600,000, 1.89 percent of the total estate. On May 31, 1973 a judicial hearing with regard to the petition for executors' fees was held by Court Commissioner Lee J. Campbell. In attendance were J. M. Cunningham, attorney for the co-executors; David L. Servies, Vice President and Trust Officer of the Bank; Dan Agnew, adult grandson of decedent; Stanley Tonge, accountant for the Agnew Lumber Company; and Jay Agnew. Zan Agnew had been orally notified of the hearing but did not attend. The hearing lasted between 30 and 40 minutes. After taking the testimony of witnesses and examining the file, Commissioner Campbell approved the fees of both executors. Commissioner Campbell has acted as Court Commissioner in Lewis County on a part-time basis for approximately 35 years. Serving as the only judge in Lewis County was D. J. Cunningham, the brother of J. M. Cunningham. Although Judge D. J. Cunningham issued at least one order concerning the estate, J. M. Cunningham, attorney for the estate, felt that the interests of all concerned would be best served if his brother did not sit on the case. Accordingly, the case was handled by Commissioner Campbell. *208 In most instances, the minimum fee schedule of the Lewis County Bar Association is used by the court in determining ordinary executors' fees. The schedule does not contemplate contested matters, litigation or any other such non-ordinary services. If the minimum fee schedule had been applied, the fee of Jay Agnew would have been between $634,000 and $635,000. The gross value of the entire community estate, plus decedent's one-half community interest in the 1965 gift, was approximately $31,700,000. It consisted of real estate and improvements, mineral rights, stock, bonds, livestock and other miscellaneous assets. Of the $600,000 fee paid to Jay Agnew, $100,000 was paid in 1969 and $500,000 in 1971. One-half of this fee (chargeable to decedent's one-half interest in the whole community property of decedent and his wife subject to probate) was deducted on the estate tax return as an administrative expense. OPINION Respondent contends that to the extent Jay Agnew performed services with a value in excess of $250,000, those services are non-deductible services of a defacto trustee or activities which were for his personal benefit, or if performed on behalf of the estate, *209 are unreasonable and excessive in amount. The estate maintains that at all times Jay Agnew was acting as an executor and that his $600,000 fee was reasonable in amount and is deductible. We accept the estate's contentions, finding that at no relevant time did Jay Agnew act as trustee instead of executor, and that the $600,000 fee represented fair compensation for his services as such executor. Hence one-half of the $600,000, or $300,000, [6] is an allowable deduction by the estate under section 2053 of the Internal Revenue Code. [7]
*210 The estate argues first that Jay Agnew's executor's fee attributable to decedent's one-half of the community property is deductible as a matter of law under section 2053 because allowed by the jurisdiction under which the estate is being administered, relying on Estate of Park v. Commissioner,475 F. 2d 673 (C.A. 6, 1973). However, since the estate filed its briefs in this case, the Second Circuit has affirmed our reviewed opinion in the case of Estate of David Smith,57 T.C. 650 (1972), affirmed 510 F. 2d 479 (1975). As stated by the Second Circuit, "federal courts cannot be precluded from reexamining a lower state court's allowance of administration expenses to determine whether they were in fact necessary to carry out the administration of the estate or merely prudent or advisable in preserving the interests of the beneficiaries." Estate of Smith v. Commissioner, 510 F. 2d at 482-483 (C.A. 2, 1975). The fact that Commissioner Campbell approved the total $600,000 payment does not necessarily demonstrate that decedent's *211 one-half of it is a deductible executor's fee. See section 20.2053-1(b)(2), Estate Tax Regs. Respondent's innuendo that as a friend of the executor's attorney, the Commissioner was somehow biased or influenced is not justified. As a witness Commissioner Campbell impressed this Court as credible and forthright. Moreover, respondent--who called the Commissioner as a witness-had every opportunity to expose any impropriety or prejudice on the part of Commissioner Campbell while he was on the stand. Nothing irregular was discovered. The fact that members of bench and bar in a small town know each other is not surprising. Standing alone, this fact implies nothing and from it we infer nothing. We now turn to the question whether Jay Agnew was functioning as executor or defacto trustee. If the latter, there would be no estate tax deduction for the fees attributable to such activities. Marion M. Jackson, Executor,18 B.T.A. 875 (1930); see also Estate of Streeter v. Commissioner,491 F. 2d 375 (C.A. 3, 1974); and Sharpe's Estate v. Commissioner,148 F. 2d 179 *212 (C.A. 3, 1945). While it is true, as respondent notes, that the activities of Jay Agnew with regard to the assets of the estate were not those of the ordinary executor, it must be borne in mind that neither the assets of the estate nor the estate itself were ordinary. Mineral land and timber land by their very nature will generally involve a long-term view if they are to be retained. The decision to retain the assets was within Jay Agnew's discretion. Clearly, the executor of an estate is under no duty to alienate assets; indeed, had Jay Agnew done so he might well have been liable to the other residual beneficiaries. The fact that the coal land was leased on a long-term basis in no way hampered the ultimate settlement of the estate, for the expiration of the leasehold interest is not a condition precedent to the distribution of the land to the heirs. The purchase of securities with a view to long-term capital appreciation likewise did not postpone the closing of the estate. Nor, obviously, did the cutting of the estate's timber under the pre-existing contract made by the decedent with Jay Agnew in his individual capacity. In fact, this contract provided the estate in part with the *213 funds necessary to pay for taxes, administrative costs and interest. The basic reason the estate had to remain in existence was to settle or litigate the many taxes asserted by the Federal government and the States of Washington, Oregon and California. Considering all of the facts and examining the legal precedents in the area, we conclude that the estate was not a defacto trust for tax purposes and could not prudently have been terminated prior to payment of all tax liabilities. Respondent's reliance upon Marion M. Jackson,Executor,18 B.T.A. 875 (1930) is misplaced. In Jackson the decedent's will directed that the estate remain open until decedent's grandson, then less than five years of age, reached the age of thirty. This Court, in a reviewed decision, denied the estate a deduction for that portion of the executor's fee not yet paid but expected to be earned during the administration of the estate. "[From] and after the date in which the accounts receivable were collected and the debts paid, the executor was acting as trustee." 18 B.T.A. at 886-887. Here, and through no fault of the co-executors, all debts have not been paid, *214 namely certain Federal and State estate, inheritance and income taxes. [8] Compare Charlotte Leviton Herbert,25 T.C. 807 (1956). Having concluded that no defacto trust existed, and that Jay Agnew was acting as co-executor, we turn to the question of the reasonableness of the amount of his claimed compensation. Washington law provides that the amount which "the court shall deem just and reasonable" [9] shall be used in setting the fee of an executor. Precedent is not of great value in this realm, for this is an area in which "each case must stand on its own footing * * *". In re Belknap's Estate,12 Wash. 2d 643, 665, 123 P. 2d 358, 367 (1942), *215 quoting In re Fetterman's Estate,183 Wash. 410, 413, 48 P. 2d 638, 639 (1935). See also the criteria the Washington courts should consider as described in In re Peterson's Estate,12 Wash. 2d 686, 728, 123 P. 2d 733, 752 (1942), quoted with approval in In re Bailey's Estate,56 Wash. 2d 623, 627, 354 P. 2d 920, 923 (1960). According to the minimum fee schedule of the Lewis County Bar Association, the executor's fee Jay Agnew was entitled to for ordinary services (marshaling assets, paying debts, conserving assets and distributing the net estate) was between $634,000 and $635,000. Not only did Jay Agnew handle the ordinary executor's duties, but he also handled many extraordinary matters (including extensive state and federal tax litigation, negotiation of the coal lease, and the development and carrying out of a long-term plan of management for the timberlands) for which he is entitled to additional, extraordinary fees. The only fees he received were from the Washington probate. No executor's fees were paid in connection with the Oregon ancillary probate. Jay Agnew was ultimately responsible for both the Washington and Oregon probates. *216 After weighing the testimony of petitioner's experts, reviewing all of the services actually performed and considering the magnitude of Jay Agnew's responsibility, we find the $600,000 fee wholly reasonable. While we recognize that at times certain acts performed by him benefited both the estate's property and property held by Jay Agnew personally, we conclude that were an allocation to be made, the value of the services which benefited solely the estate would not be less than $600,000. To reflect the concessions previously made Decision will be entered under Rule 155.
Footnotes
1. Kathryn Agnew died on June 14, 1971. ↩
2. See Revised Code of Washington, section 11.68.010↩ (1965).
3. Although Oregon is not a community property state, the Oregon property was purchased with Washington community property and was treated by decedent and his wife and the various taxing authorities like community property, i.e., all of it was included in the Oregon probate but only decedent's one-half was included in his taxable estate. ↩
4. This resulted in a dispute with the State of "Continued" California concerning the value of the gift for state inheritance tax purposes. At the time of trial the dispute had not been resolved. No ancillary administration was required in California.↩
5. This refers to purchasing a piece of land to fill out a section.↩
6. Only one-half of the fee, chargeable to decedent's one-half interest in the whole community property of the decedent and his wife subject to probate, is deductible on the estate tax return as an administration expense. ↩
7. Section 2053 provides in part: (a) General Rule.--For purposes of the tax imposed by section 2001, the value of the taxable estate shall be determined by deducting from the value of the gross estate such amounts-- * * * (2) for administration expenses, * * * as are allowable by the laws of the jurisdiction, whether within or without the United States, under which the estate is being administered.↩
8. Respondent asserts that "there is no reason at all why the great bulk of assets should not have been formally transferred over to the testamentary trustees, retaining only that portion necessary to provide for the disputed taxes." The amount of the disputed taxes, however, was unknown and potentially enormous. Had the co-executors guessed wrongly, they would have had to attempt to recover the assets from the transferees under penalty of personal liability.↩
9. Revised Code of Washington, section 11.48.210↩ (1965).